Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

```
-----------------------------------
                                :
JASON MOBERLY,                  :
                                :
              Plaintiff,        :
                                :
         vs.                    :    CASE NO.
                                :    1:08-cv-00569
UNIVERSITY OF CINCINNATI        :
CLERMONT COLLEGE, et al.,       :
                                :
              Defendants.       :
                                :
-----------------------------------
```

| | |
|---|---|
| DEPOSITION OF: | JASON MOBERLY |
| TAKEN: | By the Defendants |
| DATE: | June 15, 2009 |
| TIME: | Commencing at 9:10 a.m. |
| PLACE: | Offices of: <br> Taft, Stettinius & Hollister <br> 425 Walnut Street <br> Suite 1800 <br> Cincinnati, Ohio  45202 |
| BEFORE: | Raymond E. Simonson <br> Registered Merit Reporter <br> Notary Public-State of Ohio |

Page 2

```
1   APPEARANCES:
2         On behalf of the Plaintiff:
3            MARC D. MEZIBOV, ESQ.
                of
4            The Law Offices of Marc Mezibov
             425 East Court Street
5            Cincinnati, Ohio  45202
6         On behalf of the Defendants:
7            DANIEL J. HOYING, ESQ.
                and
8            DOREEN CANTON, ESQ.
                of
9            Taft, Stettinius & Hollister LLP
             425 Walnut Street
10           Suite 1800
             Cincinnati, Ohio  45202
11
          Also present:  Ann Appleton
12                        Kimberly Ellison
                          James McDonough
13                        Ben Lindy
14                        - - -
15        S T I P U L A T I O N S
16            It is stipulated by and among counsel
17   for the respective parties that the deposition of JASON
18   MOBERLY, the Plaintiff herein, may be taken at this
19   time by Counsel for the Defendants as upon
20   cross-examination pursuant to the Federal Rules of
21   Civil Procedure; that the deposition may be taken in
22   stenotypy by the notary public-court reporter and
23   transcribed by him out of the presence of the
24   Plaintiff; that the transcribed deposition is to be
```

Page 3

```
1    submitted to the witness for examination and signature;
2    and that signature may be affixed out of the presence
3    of the notary public-court reporter.
4                        - - -
5
6
                       I N D E X
7
     JASON MOBERLY                          PAGE
8
     CROSS-EXAMINATION BY MR. HOYING          5
9
     EXAMINATION BY MEZIBOV                  157
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
1                  E X H I B I T S
2    Moberly Exhibit Number          Marked    Referenced
3       1                   7         -
4       2                  10        34, 159
5       3                  13         -
6       4                  21        112
7       5                  31        112
8       6                  41        119, 131
                                     143, 148
9
        7                  87        126
10
        8                  91        139
11
        9                  93        139
12
        10                 93        139
13
        11                104        127
14
        12                109         -
15
        13                138        140
16
        14                146         -
17
        15                157         -
18
19
20
21
22
23
24
```

Page 5

```
1               JASON MOBERLY
2    of lawful age, a witness herein, being first duly sworn
3    as hereinafter certified, was examined and deposed as
4    follows:
5               CROSS-EXAMINATION
6    BY MR. HOYING:
7       Q.    Good morning, Mr. Moberly.  My name is Dan
8    Hoying. I'm here with Doreen Canton.  We represent the
9    University of Cincinnati and the individual Defendants.
10   They're Kim Ellison, Dean McDonough, and Ann Appleton.
11   And then we are also joined by a summer associate at
12   our firm, Ben Lindy.
13          Can you state your name for the record?
14      A.    Jason Moberly.
15      Q.    And your date of birth?
16      A.    March 26th, 1980.
17      Q.    We have a court reporter here today.  So
18   to make his job easier, please answer my questions out
19   loud.  Nodding or shaking your head, that won't be
20   reflected in the transcript.  So try to answer with
21   "yes" or "no," instead of "um-hmm" or "uh-huh."
22          Wait for me to finish a question, and I
23   will try to wait for you to finish responding before I
24   ask the next question.  If you do not hear a question,
```

Page 6

1  please ask me to repeat it.  If you do not understand
2  it, please tell me, and I will rephrase the question in
3  a way that you understand.  Is that fair?
4      A.   Yes.
5      Q.   If you need to take a break or need to
6  step out to use the restroom or something like that,
7  that's fine.  I'll probably ask you to finish answering
8  my question, but just ask me if you need to take a
9  break.
10         Are you taking any drugs, alcohol, or
11 medication that would affect your ability to testify?
12     A.   No.
13     Q.   Okay.  Any medical problems or conditions
14 that would prevent you from testifying truthfully and
15 completely?
16     A.   No.
17     Q.   Any other problems that would impair your
18 ability to testify?  Lack of sleep?  Stress?
19     A.   No.
20     Q.   Did you speak to anyone in preparation for
21 this deposition, other than your attorney?
22     A.   No.
23     Q.   Did you review any documents?
24     A.   No, other than with my attorney.

Page 7

1      Q.   Anything that's not been produced to the
2  University Defendants as far as you are aware?
3      A.   No, I think they have everything.
4      Q.   Have you ever had your deposition taken
5  before?
6      A.   No.
7      Q.   Did you give a deposition in the
8  dissolution-of-marriage proceeding?
9      A.   No.
10     Q.   Ever given any sworn testimony before?
11     A.   No, I don't even think that was.
12         MR. HOYING:  I'll mark this as the first
13 exhibit in the deposition.
14         MR. MEZIBOV:  Dan, are we going to go
15 consecutive?  I don't know where we left off the
16 last time.
17         MR. HOYING:  I think we can start over --
18 you mean as far as deposition exhibits?
19         MR. MEZIBOV:  Yes.
20         MR. HOYING:  I don't know where we left
21 off either.  Let's start over again.
22         (Moberly Exhibit No. 1 was marked for
23 identification.)
24     A.   (Witness reviewing document).

Page 8

1      Q.   Have you had a chance to review the
2  Interrogatories that the Defendants sent to you?
3      A.   Yes.
4      Q.   And this is a copy of your responses?
5      A.   Yes.
6          MR. MEZIBOV:  What are we calling this
7  exhibit?
8          MR. HOYING:  I'm sorry.  This is Moberly
9  Exhibit 1.
10     Q.   You've had a chance to review the
11 responses that you gave?
12     A.   Yes.
13     Q.   Are all the responses accurate?
14     A.   Yes.
15     Q.   Do you want to take a second to review
16 or --
17     A.   No, I'm fine.
18     Q.   The responses are accurate?
19     A.   (Witness reviewing document).  Okay.
20     Q.   If you look at the last page.
21     A.   (Witness reviewing document).
22     Q.   That's your signature on the verification
23 page?
24     A.   Right.

Page 9

1      Q.   And you understand that, by signing, you
2  are swearing to the truth of the answers?
3      A.   Yes.
4      Q.   If you can turn to Interrogatory No. 4.
5      A.   (Witness reviewing document).
6      Q.   In this Interrogatory, the University
7  Defendants have asked you to identify all legal
8  proceedings, including bankruptcy, in which you have
9  been named as a witness, party, or charging party.  Do
10 you see that?
11     A.   Yes.
12     Q.   You responded that you have been involved
13 in a single legal proceeding, a divorce dissolution
14 proceeding in Fayette County?
15     A.   Right.
16     Q.   Have you ever been involved in any other
17 judicial proceedings, civil or criminal?
18     A.   No.
19     Q.   Never been involved in a criminal
20 proceeding?
21     A.   No.
22     Q.   Do you recall when you were employed by UC
23 that you had to undergo a criminal records check?
24     A.   Yes.

Page 10

1        MR. HOYING:  Mark this as Moberly Exhibit
2   2.
3        (Moberly Exhibit No. 2 was marked for
4        identification.)
5   A.   **(Witness reviewing document).**
6   Q.   Have you seen this document?
7   A.   **Yes, I believe so.**
8   Q.   This is a copy of the criminal record
9   check that was obtained by the University of Cincinnati
10  when you became employed by them.
11  A.   **Right.**
12  Q.   According to the check, you were arrested
13  on June 5th for a domestic violence; is that accurate?
14  A.   **Yes.**
15  Q.   Did you have to go to court?
16  A.   **No.  The charges were dropped.**
17  Q.   The second part says "Final COURT
18  Disposition."  You were convicted of a lesser offense
19  of disorderly conduct; is that accurate?
20  A.   **Right, yeah.**
21  Q.   Did you have a Public Defender --
22  A.   **Yes.**
23  Q.   -- defend you?
24  A.   **Yes.**

Page 11

1   Q.   You received a 30-day suspended sentence?
2   A.   **Yes.**
3   Q.   One-year probation?
4   A.   **Yes.**
5   Q.   You were fined as a part of the
6   proceeding?
7   A.   **Yeah, I believe so.**
8   Q.   Ordered to stay away from the victim?
9   A.   **Yeah.**
10  Q.   Do you agree that this is a legal
11  proceeding?
12  A.   **What?  In this (indicating)?  Yes.**
13  Q.   But you did not disclose it in the Answers
14  to your Interrogatories?
15  A.   **I've got that I had a dissolution.**
16  Q.   Right.
17  A.   **The charges that were dropped was for a**
18  **disorderly conduct.  And when I went down to get my**
19  **background check done, they said not to worry about it,**
20  **it would have no effect on my hiring at UC.**
21  Q.   You understand that your Domestic
22  Relations dissolution was a different court proceeding
23  than your conviction; is that correct?
24  A.   **Yeah.**

Page 12

1   Q.   Do you understand that?
2   A.   **(Nodding head affirmatively).**
3   Q.   Is that a "yes"?
4   A.   **"Yes."**
5   Q.   You were a party in that case?
6   A.   **Yes.**
7   Q.   Did you ever testify under oath in the
8   criminal proceeding?
9   A.   **No.**
10  Q.   Any other legal proceedings that you did
11  not disclose in responding to Defendant's
12  Interrogatories?
13  A.   **No.**
14  Q.   Have you been involved in any other civil
15  proceedings, other than your divorce dissolution?
16  A.   **No.**
17  Q.   Have you ever filed for bankruptcy?
18  A.   **No.**
19  Q.   Have you ever been involved in an
20  administrative proceeding?
21  A.   **No.**
22  Q.   Have you ever filed a charge of
23  discrimination with an agency?
24  A.   **No.**

Page 13

1   Q.   Any other responses to your
2   Interrogatories incomplete?
3   A.   **No, I don't believe so.**
4        MR. HOYING:  Mark this as Defendant's
5   Exhibit 3.
6        (Moberly Exhibit No. 3 was marked for
7        identification.)
8   Q.   Did you have a chance to review
9   Defendants' Requests for Documents in this case?
10  A.   **Yes.**
11  Q.   Did you provide all responsive documents
12  to your attorney?
13  A.   **Yes.**
14  Q.   Since you responded on May 1st, 2009, have
15  you found any other documents that relate to this
16  lawsuit in any way?
17  A.   **I don't think so.**
18  Q.   Have you given any other documents to your
19  attorney?
20  A.   **The only thing -- I don't even know when I**
21  **gave them to him.**
22       MR. MEZIBOV:  Well, first, there's an
23  objection.  The answer, off the record, is no.
24  But if there was, I would object based on

4 (Pages 10 to 13)

Page 14

1    attorney-client privilege.
2    Q.    As far as you know, all the responses in
3  the Request for Documents are truthful?
4    A.    **Yes.**
5    Q.    Do you keep a calendar, Mr. Moberly?
6    A.    **Yes.**
7    Q.    If you can look at Request No. 2.
8    A.    **(Witness reviewing document).**
9    Q.    Do you see that Defendants ask for all
10  diaries, journals, appointment books, and calendars?
11    A.    **Yes.**
12    Q.    Did you turn that over to your attorney?
13    A.    **I didn't keep a calendar of any of these**
14  **events. Everything that I've given him is what I've**
15  **had.**
16    Q.    So nothing on your calendar included a
17  record of any events related to your claims?
18    A.    **Other than what I've given him.**
19    Q.    Did you record the meetings that you had
20  with anyone at UC on your calendar?
21    A.    **I know we have an email.**
22    Q.    What kind of an email?
23    A.    **Just an email back and forth between me**
24  **and Mr. McDonough.**

Page 15

1    Q.    Are any of the appointments that you took
2  with employees of UC reflected on your calendar?
3    A.    **No, other than the email that I sent back**
4  **and forth to Mr. McDonough that has a date.**
5    Q.    But none of the appointments you had are
6  on the calendar you keep?
7    A.    **No, I don't believe there was any**
8  **appointments other than that one.**
9    Q.    Okay. Have you taken any notes of any
10  conversations that you have had with anyone at the
11  University?
12    A.    **No, I don't believe so.**
13    Q.    Have you recorded any conversation that
14  you had with anyone at the University?
15    A.    **No.**
16    Q.    Are you currently married, Mr. Moberly?
17    A.    **No.**
18    Q.    Do you have any prior marriages?
19    A.    **Just the one that I had.**
20    Q.    And what was your spouse's name?
21    A.    **Leslie Moberly.**
22    Q.    How long were you married?
23    A.    **Five years.**
24    Q.    When were you divorced -- were you

Page 16

1  divorced?
2    A.    **The dissolution was October 5th.**
3    Q.    Of what year?
4    A.    **This is '09. I believe '07 or '06.**
5    Q.    Any children?
6    A.    **Three.**
7    Q.    What are their names and ages?
8    A.    **J███, she's seven; J███, who is five;**
9  **and J██ is three.**
10    Q.    How do you spell "J███"?
11    A.    **J-█████████.**
12    Q.    What was the other?
13    A.    **J██. He's three.**
14    Q.    Where do they live?
15    A.    **With their mom.**
16    Q.    What is your current address?
17    A.    **3585 State Route 134, Mt. Orab, Ohio.**
18    Q.    Your ZIP?
19    A.    **45154.**
20    Q.    How long have you lived at that address?
21    A.    **About three years. After I got the**
22  **dissolution, that's where I moved to.**
23    Q.    Is that a house or an apartment?
24    A.    **It's a house. That's where — my parents**

Page 17

1  have that address.
2    Q.    So your parents live with you?
3    A.    **Yeah. I help take care of my dad.**
4    Q.    So your dad lives with you. Anyone else
5  live there?
6    A.    **My mom does.**
7    Q.    Anyone else?
8    A.    **No.**
9    Q.    Before that address, where did you live?
10    A.    **I think it was 12437 U.S. 62, Leesburg,**
11  **Ohio.**
12    Q.    Leesburg?
13    A.    **Yeah.**
14    Q.    Any other addresses you can remember?
15    A.    **I lived at 4720 North Baker Road,**
16  **Lynchburg.**
17    Q.    Where did you live with Leslie?
18    A.    **All three addresses. The last one was the**
19  **Leesburg address.**
20    Q.    Any other addresses?
21    A.    **No.**
22    Q.    Do you have a computer at home?
23    A.    **Yes.**
24    Q.    Do you have an email account?

Page 18

1  A.  Yes.
2  Q.  What is your email address?
3  A.  One of them is J_MOBERLY@HOTMAIL.COM.
4  Q.  Any others?
5  A.  JMOBERLY34@YAHOO.COM.
6  Q.  Any others?
7  A.  No, that's it.
8  Q.  Do you have a MyFace or SpaceBook page?
9  A.  No, not anymore.  I used to.
10 Q.  How long ago did you have a MyFace or
11 SpaceBook page?
12 A.  I don't know.  Maybe about, I don't know,
13 five, maybe six months ago.
14 Q.  Five or six months ago?
15 A.  Yeah.
16 Q.  What was your name, screen name, or name
17 that you used on those pages?
18 A.  Jason.
19 Q.  Just Jason?
20 A.  Yeah.
21 Q.  Did you ever post messages on any other
22 Internet websites or weblogs?
23 A.  No.
24 Q.  Have you ever posted anything related to

Page 20

1  Q.  You did not receive a Bachelor's degree?
2  A.  No, not from --
3  Q.  Did you receive --
4  A.  I haven't received one yet.
5  Q.  Are you working towards a Bachelor's
6  degree?
7  A.  Yes.
8  Q.  Where are you taking classes?
9  A.  I'm getting enrolled in the United States
10 Sports Academy in Alabama.  I'm working on paperwork
11 right now.
12 Q.  Do you know what city that is in
13 Alabama?
14 A.  Daphne.
15 Q.  You've applied?
16 A.  No, I'm getting my paperwork ready to get
17 everything applied and sent in, financial aid and
18 stuff.
19 Q.  Have you been accepted?
20 A.  No, I haven't sent anything in yet.
21 Q.  And do you intend to work toward a
22 Bachelor's degree?
23 A.  Right, yes.
24 Q.  What course of study?

Page 19

1  your employment at UC?
2  A.  No.
3  Q.  Ever posted anything related to this
4  lawsuit?
5  A.  No.
6  Q.  What high school did you attend?
7  A.  I attended two.  I attended Lynchburg-Clay
8  High School, and then White Oak High School.
9  Q.  What city were those high schools in?
10 A.  Lynchburg -- well, they're both in
11 Highland County.
12 Q.  Did you attend college?
13 A.  Yes, at Southern State.
14 Q.  How many years did you attend?
15 A.  I think I was there for three years.
16 Q.  Did you graduate?
17 A.  Yes.
18 Q.  Did you receive a degree?
19 A.  Yes.
20 Q.  What degree did you receive?
21 A.  Associate of applied business/computer
22 programming.
23 Q.  That's an Associate's degree?
24 A.  Yes.

Page 21

1  A.  It will be sports management, and to
2  become an agent as well.
3  Q.  If you're accepted, when do you intend to
4  enroll?
5  A.  As soon as possible.
6  MR. HOYING:  This will be Moberly
7  Deposition Exhibit 4.
8  (Moberly Exhibit No. 4 was marked for
9  identification.)
10 A.  (Witness reviewing document).
11 Q.  Do you recognize this document?
12 A.  Yes.
13 Q.  And is this a copy of the resume you
14 provided to the University?
15 A.  The year before, I did.  They didn't get
16 my updated resume.
17 Q.  What year did you provide this to the
18 University?
19 A.  That was my first year there.  I believe I
20 applied in the summer or early fall.
21 Q.  Of what year?
22 A.  Was it 2007 -- 2007-2008.
23 Q.  That was the first year you applied to
24 work at the university?

Page 22

1    A.    **This was the first year I put in for my**
2    **coaching position, 2007-2008.**
3    Q.    And you provided this resume at that time?
4    A.    **Yes.**
5    Q.    Is the information that you provided on
6    the resume accurate?
7    A.    **At that time, yes.**
8    Q.    It says here you worked for Siemens
9    Business Services.
10   A.    **Yes.**
11   Q.    And at the time that you submitted the
12   resume, you were currently employed by Siemens
13   Business?
14   A.    **Yes.**
15   Q.    Are you still working for them?
16   A.    **Yes.**
17   Q.    What position do you hold?
18   A.    **Helpdesk Agent.**
19   Q.    What are your principal responsibilities?
20   A.    **Well, I answer the phone for any calls**
21   **coming in worldwide and help protect -- or help**
22   **troubleshoot any computer problems that they have,**
23   **whether it be hardware or software.**
24   Q.    Have you held any other positions with

Page 23

1    Siemens?
2    A.    **No.**
3    Q.    Then you were also employed by Southern
4    State Community College?
5    A.    **Yes.**
6    Q.    What non-teaching positions did you hold
7    at Southern State?
8    A.    **Well, I worked on computers there at the**
9    **college as a Technology Assistant, and I was also the**
10   **-- for three years, I was the Assistant Women's Coach,**
11   **and then, for four years, I was the Head Men's Coach.**
12   Q.    You were the Assistant Women's Coach?
13   A.    **Yeah, for three years.**
14   Q.    As the Technology Assistant, what were
15   your responsibilities?
16   A.    **I was to maintain all computer labs and**
17   **help with any professors or facility members who had**
18   **any problems with computer-related hardware or**
19   **software.**
20   Q.    You stopped working as a Technology
21   Assistant in September, 2005; is that true?
22   A.    **Yes.**
23   Q.    You stayed on as a Basketball Coach,
24   though, through the 2005-2006 season?

Page 24

1    A.    **Yes.**
2    Q.    Why did you stop working as a Technology
3    Assistant?
4    A.    **It was part time, and I was trying to**
5    **support my family.**
6    Q.    Okay.  So why did you stop working as the
7    Technology Assistant?
8    A.    **Well, the State budget cuts were cutting**
9    **back, and higher education always seems to be the first**
10   **one to get cut.  The Technology Department was ours,**
11   **and they cut our Technology Department, which resulted**
12   **in me either cutting hours or trying to find something**
13   **different.**
14   Q.    So you were told you were going to get
15   less hours?
16   A.    **Yes.  So I ended up working as a -- doing**
17   **roofing with my brother.**
18   Q.    Were you fired from that position?
19   A.    **No, I just -- I left.**
20   Q.    And then you continued coaching?
21   A.    **Right.**
22   Q.    Did you report to the Athletic Director at
23   Southern State?
24   A.    **Yes.**

Page 25

1    Q.    Who was the Athletic Director while you
2    were Basketball Coach?
3    A.    **Jim Winter.**
4    Q.    Did you have any Assistant Coaches?
5    A.    **Yes, I -- one year, I had one guy.  The**
6    **next year, my last year, I hired another one.  I only**
7    **had one Assistant Coach for the whole time I was there.**
8    **So one year I had one man --**
9    Q.    What was his name?
10   A.    **Rob Jackson.**
11   Q.    Okay.
12   A.    **And my last year, I hired Ted Clemans --**
13   **or not Ted Clemans, Ted Kramer.**
14   Q.    Did you have authority to hire Assistant
15   Coaches?
16   A.    **Yes.**
17   Q.    Did you have a budget to pay them?
18   A.    **Yes.**
19   Q.    Why did you stop coaching at Southern
20   State?
21   A.    **Well, I wanted to spend more time with my**
22   **family and ended up getting divorced.**
23   Q.    Were you non-renewed by the Athletic
24   Director?

Page 26

1   A.   Yes.
2   Q.   Why was that?  Why were you not renewed?
3   A.   There were certain things done to the gym
4   floor that were causing injuries, and I didn't agree
5   with it.  So it was best -- they had to redo the floor
6   because of it, and I didn't want to be a part of it.
7   And I voiced my opinion, and he voiced his, so (did not
8   finish response) --
9   Q.   What was done to the gym floor?
10  A.   Well, he was putting Turtle Wax all over
11  the gym floor.
12  Q.   Who was?
13  A.   It made it slick.
14  Q.   Who was?
15  A.   The Athletic Director.
16  Q.   And you voiced your concerns.  How did you
17  voice your concerns?
18  A.   I had a player get injured, and I told him
19  that the reason why was because of the Turtle Wax on
20  the floor.  And I even showed him.  I stepped out onto
21  the floor, and I just about slipped on the floor.  And
22  they had to redo the whole floor after one year because
23  it was so bad.
24  Q.   The University had to redo the floor?

Page 27

1   A.   No, it's a college, it's a community
2   college.  They had to redo the whole gym floor to get
3   all the Turtle Wax off of it.
4   Q.   The Athletic Director disagreed with you
5   that that was a cause of injury?
6   A.   Yes.
7   Q.   What did he say?
8   A.   He just said that that wasn't the cause.
9   I mean, we had to be doing something, something else,
10  although he was in the gym the whole time.
11  Q.   Did he say it was your fault?
12  A.   No, he never said it was my fault.  He
13  tried to blame the players for it.  And the players --
14  I mean, it wasn't their fault.  It's not their
15  responsibility to take care of the gym floor, it's his
16  responsibility.  And he didn't do a good job of it, or
17  they wouldn't have had to redo the floor.
18  Q.   Why did he say it was the players' fault?
19  A.   I mean, that's just how he is.  I mean,
20  any -- I mean, that's just -- it's always been that
21  way ever since I was there, so (did not finish
22  response) --
23  Q.   Did he fire you after that conversation?
24  A.   Well, it became -- with that, and we had

Page 28

1   another basketball game, where the whole school,
2   Wilmington College -- their Coach called and sent a
3   tape down and was apologizing for the way that the
4   officials handled the basketball game.  And he put the
5   blame on me.  And I told him -- I said, "That's fine,
6   you're the boss."  So, you know, we both agreed that it
7   was best not to come back.
8   Q.   So when did that incident occur?
9   A.   It was the last game of the season,
10  probably February.
11  Q.   And he said it was your fault that the
12  Referees had called the game incorrectly?
13  A.   This guy is -- yes.  This guy is -- he's a
14  little different.
15  Q.   The Athletic Director?
16  A.   Yes.
17  Q.   He was your boss?
18  A.   Yes.
19  Q.   Okay.  So you stopped coaching at the end
20  of the basketball season in 2006; is that right?
21  A.   Yes.
22  Q.   That's the '05-'06 season?
23  A.   Yes.
24  Q.   About what month would that have been?

Page 29

1   A.   I believe it was July -- or April is
2   when they decided -- or he decided to non-renew me.
3   Q.   Okay.  The basketball season ended in what
4   month?
5   A.   March.
6   Q.   March.  And it was what month when he
7   decided not to renew you?
8   A.   I believe it was in April.
9   Q.   April.  Okay.  And then you didn't
10  start working at Siemens until May of 2007; is that
11  correct?
12  A.   Yes, I believe so.
13  Q.   Did you work anywhere in the interim,
14  between April, 2006 and May, 2007?
15  A.   I did.  I worked for an Internet company,
16  basically not doing -- I basically didn't do anything.
17  And at the same time, I was working with my brother
18  putting shingles on.
19  Q.   Okay.  What is the name of the Internet
20  company?
21  A.   Dragon Internet.
22  Q.   How did you become employed by them?
23  A.   All the computer skills that I had was
24  something that they were looking for.

8 (Pages 26 to 29)

Page 30

1    Q.    Was it something that you applied for, or
2  did you know somebody that worked there?
3    A.    I applied from a newspaper article -- or
4  ad.
5    Q.    How long did you work there?
6    A.    Maybe -- I don't know.  Maybe a year or
7  less.  I don't know.
8    Q.    It was after you got non-renewed at
9  Southern State?
10    A.    Right.
11    Q.    Did you work in an office, or did you work
12  from home?
13    A.    It was an office.
14    Q.    Okay.  Then the roofing company, is there
15  a name for the roofing company?
16    A.    Leathley Roofing, L-E-A-T-H-L-E-Y.
17    Q.    Is that your brother's company?  Does he
18  own the company?
19    A.    No, he works for the owner.
20    Q.    And who is the owner?
21    A.    Terry Leathley.
22    Q.    About how many hours a week did you work
23  for Leathley?
24    A.    It all depended on the weather.  I mean,

Page 31

1  maybe -- maybe 20, 25.
2        MR. HOYING:  Mark this as Moberly
3  Deposition Exhibit 5.
4        (Moberly Exhibit No. 5 was marked for
5        identification.)
6    Q.    Do you recognize this document?
7    A.    Yes.
8    Q.    Is this a copy of the application that you
9  filled out when you began working for UC, or for
10  Clermont?
11    A.    Are you talking about this past year when
12  I got hired as an Assistant, or when I was paid through
13  a temporary service?
14    Q.    Let me ask you this.  Is this a staff
15  application that you filled out at any time to work for
16  UC or Clermont?
17    A.    My very first year when I wasn't hired.
18    Q.    The date on this document is October 15th,
19  2007; is that accurate?
20    A.    Yes, but I was hired in 2008.  They never
21  did get my updated resume or application.
22    Q.    So initially, you were not hired by UC?
23    A.    I was the second year off of this year's
24  application.  Everything was updated.  After I turned

Page 32

1  it in, when I went to go apply for the job, they had
2  the year -- the year before when I applied for the job
3  and didn't get it.  I had to be paid through a temp
4  service off this application and this resume.  When I
5  turned in the resume and application for this year,
6  2008, to be hired and paid through the University, it's
7  a whole different application and resume than what I
8  filled out than what this is.  So this here is totally
9  wrong.
10    Q.    Okay.  You filled out this application at
11  some point, though?
12    A.    In 2004, not being hired.
13    Q.    When you did that, were you applying for a
14  specific position?
15    A.    I was applying for an Assistant Coaching
16  position.
17    Q.    Okay.  How did you learn about the
18  Assistant Coaching position?
19    A.    Through Brian Sullivan and John Hurley.
20    Q.    They contacted you?
21    A.    Yes.
22    Q.    Well, how did they contact you?
23    A.    Well, they let me know that the job was
24  posted.  After Southern State, I contacted Coach Hurley

Page 33

1  to see if there was anything I could do to be involved
2  with anything that he was a part of.  And once I got
3  down to UC-Clermont, they let me know that a job had
4  come open, because the guy who had previously had it
5  wasn't going to take it.  So I applied for it.
6    Q.    Okay.  This is still in 2007?
7    A.    Right.
8    Q.    Okay.  Were you applying to work for any
9  position at the University, or just for an Assistant
10  Coaching job?
11    A.    Just for Assistant Coach.
12    Q.    Have you ever applied for any other
13  position at Clermont or UC?
14    A.    No.
15    Q.    And you've never held any other position
16  at Clermont or UC?
17    A.    No.
18    Q.    Are the responses you provided in this
19  application truthful?
20    A.    Yes.
21    Q.    Look at Page 2 of the document.
22    A.    (Witness reviewing document).
23    Q.    You were asked for your conviction
24  history, but you did not disclose any criminal

Page 34

1  convictions on your application; is that correct?
2      A.    I wasn't convicted of anything.
3          (Reference to previously-marked Moberly
4          Exhibit No. 2.)
5      Q.    Do you still have Moberly Exhibit 2 in
6  front of you?
7      A.    (Witness reviewing document).  The
8  disorderly conduct?  When I filled this application
9  out, I even met with Sissy Detty from Washington
10  Courthouse Police Department.  And she said, "That
11  doesn't matter, because you weren't convicted of the
12  disorderly conduct."
13      Q.    Doesn't it say, in the criminal records
14  check, that you were convicted of a lesser offense of
15  disorderly conduct?
16      A.    Well, when I was up there, they told me
17  that I would -- I had a year's probation.  I had to
18  meet with Sissy Detty.  She said that I was never
19  convicted of anything.  They put the disorderly on me,
20  because the cops were called.  And they had to charge
21  me with something, so I was charged with disorderly
22  conduct.  But they never said that I was convicted of
23  anything.
24      Q.    Did you interview with anyone in 2007?

Page 35

1      A.    No.
2      Q.    So you had spoken to Coach Hurley, and
3  he encouraged you to apply for the job; is that
4  correct?
5      A.    Yes.
6      Q.    But then UC did not give you the job.  Can
7  you give some more background about that?
8      A.    Well, from what I was told by Brian was
9  that it was too late to hire anybody, so they were
10  going to pay me through the temp service and for me to
11  apply the following year.  So in January, I finally
12  received the papers to turn in for the temp service,
13  and I got that -- I had that turned in, filled out and
14  turned in.
15      Q.    When did you start coaching the team at
16  Clermont?
17      A.    In October -- well, basically, all summer,
18  you have open gyms.  I was there every day in open gym.
19  And the season, the first day of practice was October
20  1st.
21      Q.    What were your responsibilities with
22  respect to coaching?
23      A.    I had to recruit players to bring in,
24  assist Coach Hurley in anything he needed, whether it

Page 36

1  be practices or games.
2      Q.    Did you attend all practices?
3      A.    Yes.
4      Q.    What were your responsibilities during
5  practice?
6      A.    Well, I was -- my responsibilities
7  consisted of working with the perimeter players,
8  helping him, you know, during practice, making sure all
9  the players were in the right spot in everything that
10  we were doing.
11      Q.    Any responsibilities before or after
12  practice?
13      A.    No.
14      Q.    Do you attend all the team's games?
15      A.    Yes.
16      Q.    What are your responsibilities during the
17  games?
18      A.    Well, just sit, sit there on the bench and
19  help Coach Hurley.  I mean, I keep stats.  So if I saw
20  something, I told Coach Hurley.  And if he agreed,
21  great; if not, fine.
22      Q.    Any responsibilities before the games?
23      A.    No.  I helped gather all the players
24  into the locker room so they can -- so they can get

Page 37

1  focused.
2      Q.    What about after the games?
3      A.    Yeah.  We made sure that we had all the
4  uniforms and everything, score books.  I gathered all
5  that to give to Coach Hurley before he left.
6      Q.    Did you travel with the team?
7      A.    Yes.
8      Q.    Does the team stay overnight when they
9  travel?
10      A.    Not all the time.  A couple times, if it's
11  a long trip, they will stay.
12      Q.    Do you stay with the team when they
13  travel?
14      A.    Yes.
15      Q.    Do you have any responsibilities when the
16  team is traveling?
17      A.    Well, I make sure that they're not up
18  running around in the middle of the night.
19      Q.    You said you're involved in recruiting?
20      A.    Yes.
21      Q.    What are your responsibilities with
22  respect to recruiting?
23      A.    Well, I go to high school games.  I get
24  contacts from high school coaches from all over.  I go

Page 38

1  to the games and talk to the kids, find out what they
2  want to -- what they want to major in, you know, try to
3  convince them that Clermont is the place for them to go
4  academically and athletically, and that's pretty much
5  all recruiting is.
6       Q.    Are you involved in scheduling for the
7  team?
8       A.    No.
9       Q.    Are you involved in making sure players
10  are eligible?
11       A.    Well, if they have problems, they come --
12  they come to the Coaches, but we don't -- we can't
13  really do anything about it.
14       Q.    Are there eligibility requirements for
15  your players?
16       A.    Yes.
17       Q.    What are some of those requirements?
18       A.    Well, I mean, it depends.  It's supposed
19  to be -- I think the ORCC rules are a 1.7, which is the
20  league that we play in, which I think is ridiculous.  I
21  think it should be higher.  But the USCAA, which we
22  participate in, I believe, is a 2.0 with 20 accredited
23  hours as a freshman, and I think 36 if you're a
24  sophomore.  See, I'm not real sure, because things have

Page 39

1  changed.  Things are different.  I'm not real sure.
2       Q.    When you're giving these numbers, 2.0,
3  1.7, does that refer to the GPA?
4       A.    Yes.
5       Q.    And what is the USCAA?
6       A.    2.0.
7       Q.    No, I'm sorry.  What does "USCAA" stand
8  for?
9       A.    United States -- what is it?  United
10  States -- I can't even remember.
11       Q.    What is the USCAA?
12       A.    It's just an affiliation right below the
13  NAIA.  It's an affiliation, just like any other college
14  plays in.  I think it's United States or United Small
15  College Athletic Association.  It used to be called
16  that.  I'm not sure whether it is still or not.
17       Q.    Are there any eligibility requirements
18  other than GPA?
19       A.    Well, you have to pass your credit hours,
20  you have to have credit hours to move on.
21       Q.    There's a minimum number of credit hours?
22       A.    Yeah.
23       Q.    And those differ, depending on --
24       A.    Well, I think incoming -- I mean, this is

Page 40

1  a new thing that was just put in.  Incoming freshmen
2  are lower, but anybody -- the returning players that we
3  have and anybody that's played at another college has
4  to have a 2.0, and they basically would have to pass 12
5  credit hours a quarter, which is well within reach.
6       Q.    Do you have any responsibilities with
7  respect to your players' academics?
8       A.    Well, there's -- I'm limited, very
9  limited, in what I can do.  They come to me, and I try
10  to point them in the right direction.  But if -- I
11  mean, I can't do anything -- I can't go in and change a
12  grade.  I mean, I try to point them in the right
13  direction, and I -- I mean, that's as much as I can do.
14       Q.    Any other responsibilities with respect to
15  the team?
16       A.    Not that I'm aware of.
17       Q.    Have your responsibilities changed since
18  you started coaching?
19       A.    Yes.
20            MR. HOYING:  We'll take a short break.
21            (At which time, a recess was taken from
22            9:49 a.m. until 10:04 a.m.)
23            MR. HOYING:  This is going to be Moberly
24            Deposition Exhibit No. 6.

Page 41

1            (Moberly Exhibit No. 6 was marked for
2            identification.)
3       A.    (Witness reviewing document).
4       Q.    Mr. Moberly, are you familiar with the
5  Complaint that was filed against Defendants on your
6  behalf?
7       A.    Yes.
8       Q.    Have you had an opportunity to review the
9  Complaint?
10       A.    Yes.
11       Q.    You agree that all the allegations in the
12  Complaint are truthful?
13       A.    Yes.
14       Q.    Look at the Complaint, Paragraph 11 on
15  Page 4.
16       A.    (Witness reviewing document).
17       Q.    It says, during your employment,
18  "Plaintiff became concerned that African-American
19  basketball players frequently encountered difficulties
20  in their interactions with UC Clermont's administration
21  and in utilizing general student services.  Plaintiff
22  perceived that these players and other African-American
23  students were being subjected to unfair and/or
24  discriminatory treatment."

Page 42

1        This is a truthful statement of your
2    experience at Clermont?
3        A.    Yes.
4        Q.    When did you first perceive this unfair
5    and/or discriminatory treatment?
6        A.    Well, I did have a player come to me who
7    was denied access. According to him, he went in to get
8    access through the Learning Disability Center, and he
9    was told that nobody could help him at that time. As
10   he was walking out, there were some White kids that
11   walked in, and they were immediately helped.
12           Now, when you have a kid like that that
13   has tears in his eyes, who is no longer going to
14   college there because he was denied access from the
15   Learning Disability Center there at the college, and
16   that's coming straight from him.
17       Q.    When did this occur?
18       A.    During the school year. I mean, I
19   don't -- it was -- I don't know. During -- I don't
20   know exactly when.
21       Q.    Was it this year or last year?
22       A.    It wasn't this year.
23       Q.    What time of year was it?
24       A.    I think it was, like, last spring, maybe.

Page 43

1    It was nice weather out.
2        Q.    Spring of 2008 or spring of 2009?
3        A.    I think 2008.
4        Q.    What was the student's name?
5        A.    R██ S███.
6        Q.    And how did you learn about this incident?
7        A.    Well, I took him back to his apartment --
8    he stayed on campus -- so that he wouldn't have to
9    walk. And he got out, and he started up the stairs and
10   come back and had tears in his eyes. He said,
11   "Coach" -- he said, "I can't do it any more. He said,
12   "Nobody will help me."
13           And I asked him what he meant, and that's
14   when he told me that. And I said -- "Well," I said,
15   "we'll see what we can do, but I mean, I'm limited as
16   far as what I can do." But I told him -- I says, "I'll
17   try to help you." And the kid is -- as far as I know,
18   he's no longer a student.
19       Q.    As far as you know. Do you know if he's
20   not a student?
21       A.    I have not seen him. Usually, I'd see him
22   all the time, and I haven't seen him in probably a
23   year.
24       Q.    Do you have any idea what the

Page 44

1    circumstances are around him not being at Clermont?
2        A.    Well, this kid, he's -- I don't know. I'm
3    not sure what his family life is like, so I don't know.
4        Q.    Were you with him in the -- did you say
5    the Learning Disability Center?
6        A.    Yes. I don't -- I haven't been over
7    there.
8        Q.    You've never been there?
9        A.    No. But it's not the first time. Coach
10   Hurley has even told me before -- I brought it to Coach
11   Hurley's attention, and he said he's even had kids
12   before that's had the same problem. So I just took
13   that what S██ was telling me was true. I mean,
14   there's two different people that has told me the same
15   thing.
16       Q.    Is the student disabled?
17       A.    He has a learning disability.
18       Q.    How do you know that?
19       A.    Well, he told us that he did. And I
20   believe that once they graduate from high school and
21   move on to college, they have an IEP that goes with
22   them. I've never seen the IEP. But from R████'s
23   point, he did tell us that he had a learning
24   disability.

Page 45

1        Q.    Did he tell you that he had an IEP?
2        A.    That's what he -- well, if you have an
3    IEP, you have a learning disability.
4        Q.    What does "IEP" stand for?
5        A.    I don't know. I don't know what it stands
6    for.
7        Q.    So he told you this immediately after
8    coming out of the Learning Disability Center?
9        A.    Well, when I took him home is when he told
10   me. I don't know if it was that day or when it
11   happened. But that day I was taking him home, and
12   that's when he told me that.
13       Q.    Did he tell you what University employees
14   were working in the Learning Disability Center that
15   day?
16       A.    He did, but I can't remember who it was.
17   And I know I wrote it down, because I brought it to
18   Coach Hurley's attention. But I just -- I can't
19   remember who it was now.
20       Q.    And why did you think it was unfair
21   treatment?
22       A.    Like I said, he was denied. They told him
23   that they didn't have any -- that nobody could help him
24   at that time. But some White kids walked in, and they

Page 46

```
 1  were immediately helped.
 2      Q.   Do you know what the White kids' names
 3  were?
 4      A.   I don't know what their names were.  I
 5  wasn't even down there.  I'm just going with what
 6  S██ -- what R██ has told me.
 7      Q.   And did you report this to anyone?
 8      A.   I talked to Coach Hurley about it.
 9      Q.   And when would that have been?
10      A.   I don't know when it would have been.  It
11  would have been maybe -- well, it would have been
12  shortly after R██ brought that to my attention.
13      Q.   So it would also have been in the spring
14  of 2008?
15      A.   Yes.
16      Q.   And what did Coach Hurley say?
17      A.   He said that he knew of other kids having
18  the same problems, and there wasn't -- I mean, there's
19  not a whole lot that we could have done about it.
20      Q.   Did you go to the Learning Disability
21  Center?
22      A.   I don't know if he did or not.  I don't
23  know anybody down there to come up and talk to him
24  about it.  I tried to go to Coach Hurley and see.  He
```

Page 47

```
 1  knew everybody there, so I figured he would just take
 2  care of it now.  If he did, I don't know.
 3      Q.   You don't know what resulted?
 4      A.   No, I don't know.
 5      Q.   Did you ever talk to the player about it?
 6      A.   I never seen him again, not from that day.
 7      Q.   Is he a player?
 8      A.   He was.
 9      Q.   You have not seen him since that day?
10      A.   I dropped him off and I never did see him
11  again.
12      Q.   He stopped playing for the team?
13      A.   Well, he was ineligible at the time, so he
14  wasn't -- he would just come in and watch.  He couldn't
15  do anything.  He'd go to the weight room while we were
16  practicing or while we were in there.  I mean, the gym
17  is always open for people when we're practicing.
18      Q.   Had he ever played on the team?
19      A.   Yeah.
20      Q.   So is that the first incident of unfair
21  discriminatory treatment that --
22      A.   Like I said, I'm not ever over there in
23  the offices.  But when the kids come to me, they know
24  that we try to help them out in any way that we can.
```

Page 48

```
 1  But it was brought to my attention, when S██ D██
 2  graduated, that there was a racial comment made about
 3  him.
 4      Q.   Who is S██ D██?
 5      A.   He just graduated this year, in 2008.
 6      Q.   He's a player?
 7      A.   He was.  He graduated in 2008.
 8      Q.   And you said there was a racial comment
 9  made about him?
10      A.   Yes.
11      Q.   What was that comment?
12      A.   That he was "Black trash that didn't
13  deserve to graduate."
14      Q.   Who made that comment?
15      A.   Actually, you know, it was made over in
16  the Student Services Building, but I found out --
17  somebody told me about it.  And I think I even met with
18  Mr. McDonough about that.  I brought that up as well.
19      Q.   Who told you about it?
20      A.   It came from -- Brian Sullivan let me know
21  about it.  But there was also another individual there
22  who S██ confided in.  He confided in her, and she
23  pretty much -- I mean, she always talked to him.  She
24  was always good with our players.
```

Page 49

```
 1      Q.   What is her name?
 2      A.   Her name is Monica Johnson, and she's no
 3  longer employed by the college.
 4      Q.   She's a former employee of the college?
 5      A.   Yes.  And actually, I think she may have
 6  been the one who mentioned it to Brian.  Brian stays
 7  clear, pretty much, of everything.  But I think she was
 8  the one who overheard it.  At least, that's the way
 9  that I understand it.
10      Q.   So Monica Johnson overheard another
11  employee?
12      A.   (Nodding head affirmatively).
13      Q.   What's the name of the employee that made
14  the comment?
15      A.   I don't know who the employee was.  I
16  wasn't there.  And Monica is no longer employed by the
17  college.  After that, she's no longer employed by the
18  college, so I don't know.
19      Q.   Okay.  But you didn't hear it from Monica
20  Johnson either?
21      A.   No, I didn't hear it from her.
22      Q.   And you did not hear it from S██ D██;
23  is that correct?
24      A.   No.  S██ D██ has -- he had other
```

13 (Pages 46 to 49)

Page 50

1  things that came up, but he wasn't aware of that one.
2   Q.  So who did you learn this from?
3   A.  Brian Sullivan brought it to my attention,
4  and he said that it came from Monica Johnson, or Monica
5  mentioned it to him, so (did not finish response) --
6   Q.  Did Brian Sullivan ask you to do anything
7  about it?
8   A.  No, he just let me know, I mean.
9   Q.  Mr. Sullivan is the Athletic Director?
10   A.  Yes.  And I don't know who it was, but
11  (did not finish response) --
12   Q.  Okay.  What are "general student services"
13  as alleged in Paragraph 11 of your Complaint?
14   A.  Well, I mean, Student Services has quite a
15  bit -- to me, they have different jobs.  You have
16  people who deal with the students, and other people who
17  doesn't.  They're all in one building.  I only go over
18  there when I'm supposed to drop something off or pick
19  something up.
20   Q.  Is it called the Student Services
21  Building?
22   A.  It's just one big building that I'm aware
23  of.  They always say, "Go to Student Services
24  Building."  I say, "Where's it at?"  And they say,

Page 51

1  "It's that one big building by itself."
2   Q.  What are the offices in that building?
3   A.  I don't know.  I go into the one area just
4  to pick something up or drop something off.
5   Q.  What area do you go into?
6   A.  I just go right into the lobby of the
7  Student Services Building.
8   Q.  Have you ever observed any unfair
9  discriminatory treatment there?
10   A.  I don't hardly see anybody, other than the
11  receptionist, because everybody is working.
12   Q.  So that's a "no"?
13   A.  "No."
14   Q.  Do you know the names of any Clermont
15  employees in Student Services who caused difficulties
16  for students?
17   A.  I can't -- I don't -- I can't really think
18  of anything right now.
19   Q.  You say in your Complaint,
20  "African-American basketball players."  Are all the
21  basketball players African-American?
22   A.  Pretty much all of them.  Maybe two or
23  three are White kids.
24   Q.  Why don't you describe the racial

Page 52

1  composition of the basketball team for me?
2   A.  You probably got -- out of maybe 15 kids,
3  maybe, I think, 12 of them are African-American.
4   Q.  Is that for the '08-'09 basketball season?
5   A.  Yes, I believe so.
6   Q.  So there are 15 players; is that correct?
7   A.  I think so.  I can't remember offhand.
8  I'm more worried about what we have coming in than what
9  we've got -- what we had last year.
10   Q.  You mean recruits coming in?
11   A.  Yeah.  There may have been about 15
12  players.  We might have had about 15 players last year.
13   Q.  You said 12 of them were African-American?
14   A.  Probably about 12 of them were
15  African-American.
16   Q.  The other three are White?
17   A.  Yeah.
18   Q.  Who are the basketball players who
19  encountered difficulties?
20   A.  Well, S████ D███ was one.  R████ S███.
21  T█ D████.  J██ H███.  J████ J█████.  I'm
22  trying to think who else we had.
23   S██ S████.  That's all I can think of
24  right now.

Page 53

1   Q.  Why don't you start with S██ S████?
2  What are the difficulties he encountered?
3   A.  Well, at the beginning of the year,
4  during -- I believe it was maybe the first week of
5  practice or something.  The lady who watches over the
6  gym accused him of stealing one of the girl player's
7  cell phones.  And I called Ms. Appleton and brought it
8  to her attention, and she said that she would talk with
9  her.  And then come to find out, he never had it.
10   Then he was also accused of stealing shoes
11  by the same lady in the gym.  And what it is, you've
12  got college guys who play pranks on college guys.  I
13  mean, he just took them and hid them from the teammate.
14  And instead, she jumped over -- come to a conclusion
15  and said that he stole them when he didn't.
16   Q.  When did this occur?
17   A.  This was just this past year, in 2009 --
18  2008 -- beginning of 2008-2009 season.
19   Q.  So what month?
20   A.  Probably October.
21   Q.  The two incidents happened about the same
22  time?
23   A.  Yeah.
24   Q.  So October, 2008?

14 (Pages 50 to 53)

Page 54

1    A.    Yes.
2    Q.    And what is the lady's name who watched
3  the gym?
4    A.    Tonya something.  I can't remember her
5  last name.
6    Q.    Did she accuse Mr. S⬤ of stealing to
7  you or to someone else?
8    A.    No, she accused -- she didn't say anything
9  to us.  We found out from S⬤ that he was being
10 accused of stealing something, stealing a phone.  She
11 never said anything to those Coaches.
12   Q.    Who did she say something to?
13   A.    She must have said it to S⬤, because
14 S⬤ came up to me and said, "I'm being accused of
15 stealing something I don't even know nothing about."
16 And that's when I found out about it.  So that's when I
17 called Ms. Appleton, and she said she was going to talk
18 to Tonya and find out exactly what was going on.
19   Q.    Did the situation get resolved?
20   A.    Yes.
21   Q.    How?
22   A.    I don't know, but I never heard anything
23 else about it, and neither did S⬤.  So I just assumed
24 everything ended up fine, because if it wasn't, then

Page 55

1  I'm sure that he would have been talked to again.
2         Actually, I think she may have talken
3  (sic) to S⬤, and I think S⬤ went down and met with
4  Ms. Appleton about that.
5    Q.    Anything else happen to S⬤ S⬤?
6    A.    Not that I'm aware.  Not that I can think
7  of right now.
8    Q.    What about J⬤ J⬤?
9    A.    J⬤ J⬤ was a freshman.  For his
10 freshman year, his grades were above 2.0 at all times.
11 In the middle of his freshman year -- the academic
12 requirements were changed in the middle of our
13 basketball season.  They were increased.  They were --
14 instead of having this grade-point average, you now
15 have to have this grade-point average in the middle of
16 the basketball season.
17   Q.    Of What season?
18   A.    Of the 2007-2008 season, I believe.
19   Q.    Okay.
20   A.    And it was brought up -- it was supposed
21 to be like that.  Well, J⬤ had a 2.0, so he was
22 fine.  And the baseball team had a problem with it.
23 All the parents had a problem with it.  And so they
24 came in and complained.  And the academic requirements

Page 56

1  were brought back down.  Of course, the baseball team
2  is majority White there at Clermont.  So it was brought
3  down to the way it was supposed to be.
4         Well, as we get ready to go to the
5  National Tournament, the first -- you know, it's a
6  once-in-a-lifetime opportunity to play for a National
7  Championship in May.  J⬤ is not allowed to go,
8  because they say his financial aid is not done.  This
9  is the beginning of March.  Financial aid is supposed
10 to be already completed by then.
11        Amazingly, when we get back, his financial
12 aid was found and it was processed, and J⬤ is no
13 longer a student at Clermont College now because of
14 that.
15   Q.    When was the grade-point average changed?
16   A.    They tried to raise it in the middle of
17 our season, probably in February or January, around
18 that time.  They said, "Well, the new requirements are
19 going to be this."  And I remember telling Coach Hurley
20 that that is -- you know, "You cannot do that, because,
21 No. 1, we've already started recruiting, and you cannot
22 go back to all these kids and say, 'Well, sorry, you
23 can't come now because our college increased the grade
24 requirements in the middle of the year.'"

Page 57

1         I said, "You just can't do it."  And we
2  both agreed that it was, you know -- well, actually,
3  all the Coaches agreed that it was wrong, and, you
4  know, the baseball team -- it affected them
5  dramatically, and it went back to the way it was
6  supposed to be, the way it was.
7    Q.    Why would a grade-point average at the
8  University affect the students that you recruit?
9    A.    If they're transfers, it will affect them.
10   Q.    Okay.
11   A.    If they're high school students, whatever
12 they did in high school really don't matter
13 athletically.
14   Q.    But it would affect transfer students?
15   A.    Oh, yeah, because you have to transfer in
16 with a certain grade-point average and credits passed
17 or credits earned, so (did not finish response) --
18   Q.    So when did the GPA change?
19   A.    It tried to change in January or February.
20 Once the baseball parents came in and complained, it
21 all dropped back to the way it was originally, the
22 right way.
23   Q.    Were any players for basketball not
24 allowed to participate?

Page 58

1     A.   Oh, yeah, we had about five of them that
2 were going to be able not to participate. And luckily,
3 the former Athletic Director was there, and he said
4 that the rules were ridiculous, to go ahead and let
5 them play, because they didn't abide by that rule, to
6 go ahead and let them play.
7     Q.   So they were allowed to play?
8     A.   Yeah, but they tried hard not to let them.
9 So they wrote five of our kids ineligible, five of our
10 Black kids ineligible.
11     Q.   All five of the ineligible students were
12 Black?
13     A.   Oh, yeah.
14     Q.   But they didn't lose a game, they played
15 in every game?
16     A.   Except for J██████ J██████. J██████ J██████
17 missed a once-in-a-lifetime chance to play in a
18 National Championship game.
19     Q.   Did that have anything to do with his GPA?
20     A.   Well, at first, until he had a 2.0. And
21 then, once he had his 2.0, they came and said, "Well,
22 his financial aid isn't paid." Well, this is the
23 beginning of March. And anybody that knows -- if the
24 financial aid is messed up by then, then you need to

Page 59

1 have a talk with the financial aid person, not the kid.
2 Don't punish the kid, punish the person that screwed up
3 the financial aid. And that didn't happen. They
4 punished the kid.
5     Q.   Okay. Did it having anything to do with
6 his GPA?
7     A.   Well, no. His GPA was a 2.0. He was
8 fine. So he was fine GPA-wise.
9     Q.   So it only had to do with his GPA -- or
10 excuse me --
11     A.   Financial aid.
12     Q.   Financial aid?
13     A.   Yes.
14     Q.   So he was not able to participate in the
15 National Championship game; is that right?
16     A.   No. He went with us. Coach Hurley wrote
17 a note saying that he wouldn't participate, so he was
18 able to go with us.
19     Q.   Anything else happen to J██████ J██████?
20     A.   Well, I mean, because of that -- no,
21 that's pretty much it with him.
22     Q.   You said he's not a student anymore?
23     A.   No.
24     Q.   Do you know any -- the reason why he's not

Page 60

1 a student anymore?
2     A.   Well, if you went through that, would you
3 be a student there? I mean, he got -- he felt like he
4 was being treated unfairly. He said he'd never go
5 back.
6     Q.   How do you know that he felt like he was
7 being treated unfairly?
8     A.   Because I talked to him last weekend and
9 tried to get him to come back. And he's not the only
10 one that we've lost.
11     Q.   When did he leave the University?
12     A.   The spring quarter, I believe. He stayed
13 for the spring quarter, and then he was -- he left. So
14 he was out for -- he's been out for a whole year now.
15     Q.   And you still talk with him?
16     A.   I just actually found him, either the
17 weekend before -- I think it was the weekend before,
18 and I just talked to him last weekend. I went down to
19 his house and talked to him.
20     Q.   Did you talk to him about this lawsuit?
21     A.   No. I asked him if he'd come back and
22 play, if he'd come back to school.
23     Q.   You never mentioned the lawsuit?
24     A.   I didn't think it was any of his business.

Page 61

1     Q.   I asked if you mentioned the lawsuit.
2     A.   No, no.
3     Q.   Anything else happen to J██████ J██████?
4     A.   No, not that I'm aware of.
5     Q.   J███ H█████ is that a student?
6     A.   Yes. ██████ -- he played there before I got
7 there. He played at the college before I arrived. At
8 every college you go to, if you don't do well, you get
9 put on academic suspension, or whatever. And I'm not
10 sure what his status was. He brought everything in to
11 me, and he said he wasn't allowed to enroll in summer
12 classes. Well, the reason being was because he was on
13 academic watch or suspension, or whatever it was. And
14 we told him that that was the reason why he wasn't
15 allowed to enroll, and told him, "That's your fault,
16 you should have paid attention."
17     And he had some problems, I guess, prior
18 to that, him and T█████ D█████ both, with money,
19 money-wise, where their financial aid was paying for
20 everything, and then they'd get a bill for $800 for the
21 quarter -- or they'd get a check from their financial
22 aid saying, "Everything was paid, this is left over."
23 And then they'd end up getting a bill from the college,
24 saying, "You owe this amount of money."

Page 62

1    If you're a college student, and you get
2  an $800 check saying, "Your financial aid paid for
3  everything," you're going to spend it, and they did.
4  Then they'd get a bill from the college saying, "Well,
5  you owe this amount of money, you need to pay it or you
6  can't come back well." Well, they don't have it. They
7  just spent their financial aid money. And again, I
8  think that goes back to the financial aid office not
9  knowing what they're doing down there. And it all ties
10  in, I believe, with Student Services, so (did not
11  finish response) --
12    Q.    Do you think that has anything to do with
13  race discrimination?
14    A.    It only happens with Black kids. No White
15  kid has ever had a problem out there at Clermont.
16    Q.    You think they sent a check to him for too
17  much money because he was a Black student?
18    A.    You can look at it either way. I mean, no
19  White kid has ever had a problem.
20    Q.    Is J██ H██ Black?
21    A.    Yes. So is T███ D███.
22    Q.    So they chose the Black students to send
23  money back to, and then bill them later?
24    A.    We had three White kids on our basketball

Page 63

1  team that never had a problem in four years. How come
2  our Black kids are having problems in one year and
3  White kids haven't had a problem in four years at the
4  college?
5    Q.    Do you think the person who sent the check
6  knew that J██ H██ was Black or White?
7    A.    It's a small campus. I don't know.
8    Q.    Anything else happen to J██ H██?
9    A.    No, not that I'm aware of.
10    Q.    So he had problems with eligibility
11  because he hadn't made his financial commitments to the
12  University --
13    A.    No.
14    Q.    -- or he hadn't paid for it?
15    A.    His eligibility was his fault. The
16  financial part is not his fault. To me, that's the
17  Financial Aid Office's fault. And again, if they mess
18  up, you punish the kid for it.
19    Q.    Did he have academic problems in addition
20  to financial?
21    A.    Yeah, he did. That's why he was
22  ineligible.
23    Q.    T███ D███, tell us what happened to
24  him.

Page 64

1    A.    It's pretty much the same way with J██.
2  He's the one that received the financial aid check and
3  then was told that he owed the money. And, you know,
4  there's -- that's the whole -- I told him, "That's a
5  whole different department. You got to go talk with
6  them." Now, if he did, I don't know. But he had that
7  problem. He's had -- well, according to T███ -- and
8  again, these kids come to me. He had problems getting,
9  you know, his college -- his college paid for, and, you
10  know, getting the grant, the loans and everything, and
11  all that, you know -- to me, that's all different than
12  the financial aid. The loans and everything is his
13  responsibility. The financial aid, when they mess up
14  like that, is not his responsibility. He was punished
15  because they messed up.
16    Q.    So did he have academic eligibility
17  problems?
18    A.    When he was playing for us, he did -- or
19  he did one year. But I think when this happened was
20  the spring quarter, and I think he may have been fine
21  academically. I don't know. If he's not playing for
22  us, we don't check his academics.
23    Q.    In addition to the academics, he has to
24  have his financial situation with the University in

Page 65

1  check; is that correct?
2    A.    Absolutely.
3    Q.    Okay. And he had loans that he wasn't
4  taking care of?
5    A.    No. He put in -- he turned his financial
6  aid in. If you're -- if you make -- we had, you
7  know -- if you have more financial aid than what you
8  really need to use, you get the check for it. He
9  received a check for $800. Well, the college male,
10  he's going to go out and spend it. He got a bill from
11  the college saying, "You owe $800." Why not just
12  take the financial money and pay for it? Why write him
13  a check? They messed up, and he has to suffer. He
14  shouldn't have to hang on to $800 for three months to
15  make sure his financial aid at the college didn't mess
16  up and everything's going to be paid for.
17    Q.    Did he miss any games because of his
18  financial problems?
19    A.    He missed a season, and all that was -- I
20  mean, it wasn't just all financial, it was academic. I
21  mean, he missed some for both.
22    Q.    Anything else happen to T███ D███?
23    A.    No, not that I'm aware.
24    Q.    R███ S██'s incident with the

17 (Pages 62 to 65)

Page 66

1  Disability Office, is that the only problem you're
2  aware of that he had?
3      A.   Yes, because I know a lot of people tried
4  to help him out, you know, as far as point him in the
5  right direction.  I mean, a lot of people knew that he
6  had a learning disability, so they tried to help him
7  out, sit down and help him schedule classes.  It's just
8  that one time.  If you have a learning disability, by
9  law, he's supposed to have access to the Learning
10 Disability Center to get help, and he was denied
11 access.
12     Q.   Who helped him out in other ways?
13     A.   Well, Brian sat down with him many times
14 and helped him with his schedule, you know, tried to
15 get the times right, and told him, "At this time, these
16 classes are going to conflict, this is what you're
17 majoring in, you need this more than you need this."  I
18 know he did.  We're not allowed to touch the schedule
19 or even help them with schedules.  So I don't know
20 what -- I don't know who else helped him.
21     Q.   Do you think other people from the
22 University were trying to help him also?
23     A.   Oh, yeah, I know they were trying to help
24 him, but they didn't help him in the long run.  That's

Page 67

1  why him getting denied for that access.
2      Q.   Just on that one occasion?
3      A.   I think that that was probably the only
4  occasion.  I mean, he was a great kid.  I mean, he was
5  real nice.
6      Q.   Did he tell you why he was denied access
7  at that time?
8      A.   No.  He just -- he asked me -- he said, "I
9  don't understand how somebody like me can't get access,
10 but these people can go in any time they want."
11     Q.   So you have no idea why he was denied
12 access on that day?
13     A.   Well, no, other than what he told me.  And
14 he felt that it was because -- you know, like any
15 19-year-old boy, you walk in.  At the Clermont
16 County -- there's not many Blacks in Clermont County,
17 and he gets denied access for, you know, getting help
18 academically.  But White kids come in, and, of course,
19 he's going to think there was a racial problem.  There
20 ain't any -- there aren't hardly any -- the only Black
21 people in Clermont County probably go to the college --
22 I mean, there's just not very many out there.  So these
23 kids are all disadvantaged.
24     Q.   Did he tell you why he was denied access?

Page 68

1      A.   He asked me -- he said he didn't
2  understand why, because he was singled out, why he
3  wasn't allowed to get access when the White kids were
4  able to get in.  And I told him -- I said, "S█████, I
5  don't know, maybe they were booked, maybe they were
6  busy."  You know, I'm trying to make excuses for them.
7  The truth of the matter is, he didn't get the access
8  that he deserved.
9      Q.   On that one occasion?
10     A.   Yes.
11     Q.   Okay.
12     A.   Well, that one is the one he brought to my
13 attention.  I don't know if there's more or not.
14     Q.   You're not aware of any other occasions
15 where he was denied access?
16     A.   No, I can't remember.
17     Q.   Anything else happen with S████ D███?
18     A.   Well, S████ has -- I'm still constantly
19 in contact with S████.  S████ has mentioned to me
20 that he's applied for work study at the college.  He's
21 never gotten a work study.  According to S███ -- and
22 he's been there longer than I have, but I've never seen
23 it when I was there.  No African-American has ever had
24 work study.  Work study is offered to the kids who are

Page 69

1  less -- I don't want to say "less fortunate," but who
2  need money, who need a job, and S████ never got one.
3  He did work at the bookstore his last year, I think.
4  But that's the fourth year that he finally got a job
5  there, where he finally even got offered a job.  And I
6  don't even know if it went through the college.  I
7  mean, I don't know.  But that was one thing that he was
8  not real happy about.
9      Q.   When did that occur?
10     A.   That was for four years of his college
11 career at Clermont.  The very last year, he had a job
12 in the bookstore.  I don't know if it was for a quarter
13 or for the year or what.
14     Q.   Did he apply in the other years?
15     A.   Yeah.  He's applied.  He said, "A lot of
16 the other guys applied."  And he even told me -- he
17 said, "They won't hire us."  And I said, "Well,
18 that's" -- I said, "I don't know."  And I asked him,
19 you know, who was responsible for it, and he -- and he
20 told me, but he said, you know, "They won't hire us."
21     Q.   Well, who did he tell you?
22     A.   Well, he told me that Nancy Reveal is the
23 one who wouldn't hire him.
24     Q.   Who is Nancy Reveal?

Page 70

1    A.   I don't really know exactly.  I think she
2  handles our money.  She's the one that gave me my
3  application and stuff, my stuff to go down to the main
4  campus to get the background check done.  I don't know
5  what she does.
6    Q.   Anything else happen to S█ D█?
7    A.   Well, he had -- right at the very
8  beginning, Coach Hurley wanted to retire S█'s
9  jersey, retire S█'s number.  And we went on about
10  this for a while, for at least a month or so.  He holds
11  the scoring record.  He holds almost every record at
12  Clermont.  And he's playing pro ball now.  I mean, he
13  deserves it.  Well, the first response -- and, you
14  know, Coach Hurley was telling me, "S█ wasn't a
15  character person, he wasn't a good person, he was not a
16  character student."
17       Now, he's not going into the Academic Hall
18  of Fame, he's going into the Athletic Hall of Fame.  He
19  has all these records athletically.  Finally, we get
20  the jersey retired, which we finally did get it.  But
21  after a couple months of he not being a good person,
22  not deserving of it, you know -- after finally
23  listening to that, we finally got it retired -- or got
24  it hanging in the gym.  So I don't know.  To me, it

Page 71

1  should have been in there before any questions asked --
2  no questions asked.  If Coach Hurley wanted to retire
3  it, it should have been retired.  He's the Coach.
4    Q.   When was S█ D█'s last season?
5    A.   '98.
6    Q.   '98?
7    A.   Or 2008.
8    Q.   2008.  So this would have been the first
9  season --
10    A.   When I was there.
11    Q.   But when S█'s jersey could have been
12  retired; isn't that right?
13    A.   Well, you can retire it at any time.
14  There's no -- there's nothing written down saying that
15  it has to wait a year or two to get retired.
16    Q.   But jerseys aren't usually retired while
17  the player is still at the University?
18    A.   No, but it could have been done, you know,
19  at the beginning of the year, right when we had
20  everybody come back, maybe for the Hall of Fame
21  Weekend, instead of waiting till toward the end of the
22  season.  And that's when -- well, before, it was,
23  "Well, he don't deserve to have it retired and it's not
24  going to be retired."  Time and time again, "It's not

Page 72

1  going to be retired."  And then, finally, it's hanging
2  in the gym.  So, you know, I think, finally, that came
3  around to being, hopefully, a priority.  And I mean,
4  it's done now.
5    Q.   Did S█ D█ want to have his jersey
6  retired?
7    A.   S█ is the type of kid that he'll do
8  anything for anybody.  He's not a quality person, but
9  yet, you know, he gives money that he doesn't even have
10  to pay for their family's dinner that night.  We're
11  late going to the graduation -- I've taken him to the
12  graduation.  We're late getting there because he stops
13  and gives $40 to a classmate who doesn't have money to
14  feed her kids, but he's not a quality person.
15       See, nobody knows about that stuff.
16  Nobody knows any of that.  I'm the one that knows it,
17  along with everybody else on the basketball team.
18  S█ didn't care.  He's that type of person.  Now, he
19  says he didn't care.  But when he got down there to get
20  it retired, it meant a lot to him and to his family.
21    Q.   So he didn't initially care if his jersey
22  was retired or not?
23    A.   Yes, I think he did.  I mean, I really
24  think he did.  I know him well enough that I think he

Page 73

1  really did care.
2    Q.   Did he tell you that he wanted his jersey
3  retired?
4    A.   At first, no, but he said it would be nice
5  for everything that he had accomplished.  And I agreed
6  with him.  I said, you know, "It should be hanging in
7  the gym or posted somewhere."
8    Q.   Did he want to have his family there when
9  the jersey was retired?
10    A.   Yeah.
11    Q.   And was the jersey retired?
12    A.   Well, the jersey is now, yes.
13    Q.   Was it retired during a game in January?
14    A.   It was either in January or February, one.
15  I think it was January.  I don't know.  It may have
16  been February.
17    Q.   Who said that S█ is not a quality
18  individual?
19    A.   Well, that was coming from Coach Hurley,
20  that he's heard people say it.  And I didn't get the --
21  I've got some of the names -- you know, I caught some
22  of them, but I didn't get all of them.
23    Q.   Who are the ones you caught?
24    A.   Well, you know, he told me that he's met

19 (Pages 70 to 73)

Page 74

1  with Ms. Appleton quite a few times.  And Brian
2  Sullivan told me the same thing, that Kim and Ann said
3  that, you know, it wasn't going to happen, you know,
4  "It's not going to happen, we will not retire his
5  jersey, he's not a quality student."
6     Q.    Did you ever hear them say he was not a
7  quality student?
8     A.    No, I was never in the meetings.  I don't
9  go to meetings.  That's not my job.
10    Q.    Anything else happen to S███ D███?
11    A.    Well, yeah.  One thing, we were in a
12 National Tournament.  He separated his shoulder during
13 a basketball game, and I had to take him to the
14 hospital in the emergency room, and I rode with him in
15 the ambulance.  And when we got there -- the first
16 thing I do is, I call Brian, the Athletic Director, and
17 told him, because S███ has insurance through the
18 college.  And whatever his insurance doesn't pick up,
19 then the Athletic Department is supposed to pick up.
20 And at first, it wasn't going to be paid for.  But
21 finally, after a while -- and this is probably more the
22 insurance company than Brian.  But it finally ended up
23 getting paid for -- or getting paid.  And, you know,
24 Brian has tried to do everything he could do.  I know

Page 75

1  he did.  But S███ had some problems.  And even after
2  he graduated, he was still getting bills.  And I don't
3  know if he took them down or -- I don't know what he
4  did with them, but he was still getting bills from when
5  he was in Maine, when he hurt his shoulder.
6     Q.    Was he getting bills from someone at
7  Clermont?
8     A.    No, he was getting them from the hospital.
9  That should have been going to the college, and I don't
10 know, he was supposed to take them in.  Now, you know,
11 if he did -- this is different.  I don't know.  I mean,
12 he doesn't live here anymore.  He moved up to Columbus.
13 He'll be moving back, but I don't know.  And this was a
14 year ago.  He said -- he's never said he had any more
15 problems with it, so -- but at that time, it was a
16 problem.
17    Q.    At what time?
18    A.    In the 2008 season at the National
19 Tournament.  It was a problem while we were in Maine.
20 You know, when we get back, he has all these bills,
21 hospital bills.  And he's trying to get everything
22 taken care of.  And he takes them into Brian, and Brian
23 says, "Well, we'll pay for this.  We can't pay for
24 this, but we'll pay for this."  And finally, I think

Page 76

1  everything ended up getting paid for.
2     Q.    Brian did everything he could to help
3  resolve it?
4     A.    I think he did.
5     Q.    Anyone else at the University involved in
6  that?
7     A.    No.  I deal with the Athletic Director.  I
8  don't deal with anybody else.
9     Q.    Any other basketball players that were
10 treated unfairly?
11    A.    Not that I can remember right now.
12    Q.    All the players you mentioned were
13 African-American: S███ D███, R███ S███, T███
14 D███, J██ H███, J█████ J█████, and S██ S███?
15    A.    Yes.
16    Q.    They're all African-American?
17    A.    (Nodding head affirmatively).
18    Q.    Is that a "yes"?
19    A.    "Yes."
20    Q.    Any other basketball players that had
21 problems of unfair or discriminatory treatment?
22    A.    I can't remember.  I don't -- I can't
23 remember right now.  I don't think so.
24    Q.    Any of the White basketball players have

Page 77

1  problems?
2     A.    Never had a problem.
3     Q.    Once you found out about these complaints,
4  did you do anything to help these students?
5     A.    Well, I emailed Dean McDonough, and, you
6  know, he was on vacation -- or I talked to Karen
7  Faaborg, and he was on vacation.  When he got back, I
8  met with him.  I met with Dean McDonough.
9     Q.    Any other athletes not on the basketball
10 team that encountered difficulty with Student Services?
11    A.    Basketball is my main concern, so I don't
12 know of any.
13    Q.    Any other students encounter difficulties,
14 non-athletes?
15    A.    I don't know.
16    Q.    You say in your Complaint, again Paragraph
17 11, "Plaintiff perceives that these players and other
18 African-American students were being subjected to
19 unfair and discriminatory treatment."  What other
20 African-American students are you referring to?
21    A.    Well, there was a girl for the women's
22 team, but, see, she was just -- from talking with --
23 well, she was talking to our guys when I was there.
24 And, you know, I try not to get -- she was just going

Page 78

1    on and, you know, saying that she's had problems. But
2    at that time I didn't really -- I had more stuff to
3    worry about than try to, you know -- she has her own
4    coaches to go to. I'm more worried about my guys.
5        Q.    What's her name?
6        A.    It was -- they called her "S████,"
7    S█████ W████ or something. She had academic
8    problems -- well, that I know of. Now, what other
9    problems she had, I don't know. She's no longer at the
10   college either.
11       Q.    And you don't know her specific problems?
12       A.    No, I try not to get involved with her.
13       Q.    Any other African-American student?
14       A.    I don't know. I don't think so. I can't
15   remember.
16       Q.    Could you remember at the time that you
17   wrote this Complaint, or helped to write this
18   Complaint, the other African-American students you say
19   in Paragraph 11?
20       A.    Well, we had some -- we had some that were
21   going to play basketball that didn't, who just stayed
22   on as students, and they said that they had some
23   problems. But it was mainly trying to enroll in
24   classes, register for classes. You know, they'd try to

Page 79

1    go and set meetings up, and nobody can meet with them.
2        Q.    Do you recall their names?
3        A.    P████ -- P████ C████. And then
4    D████ -- D████ -- I don't know. He ended up --
5    he left the college. I don't know what his last name
6    is. He left too.
7        Q.    Do you recall any specific problems they
8    had?
9        A.    Just that they could never get with
10   anybody to register for classes, and I don't know -- I
11   don't know how they do it. I just tell them to go down
12   there and do it.
13       Q.    Any other instances of unfair treatment
14   that you perceived at Clermont?
15       A.    None that I can think of for these jobs.
16       Q.    Or anyone else?
17       A.    No.
18       Q.    When was the first time that you reported
19   any of this perceived unfair or discriminatory
20   treatment?
21       A.    I don't know. It was after I interviewed.
22   I called Karen Faaborg down at the main campus, and I
23   discussed -- I told her that -- I remember telling her
24   that I'd like to talk with somebody, but I was worried

Page 80

1    with the fact that it may hurt my chances of actually
2    getting the job, because I just applied for it, just
3    went through an interview. And she called Dean
4    McDonough, who was on vacation. And she called me back
5    and said that Dean McDonough was on vacation. And she
6    assured me, "Nobody will lose their job, that he will
7    meet with you when he gets back." So when Dean
8    McDonough got back, I met with him, and that was in --
9    I don't know when that was.
10       Q.    Before you talked to Karen Faaborg, did
11   you report any of the incidents of alleged
12   discrimination to anyone at Clermont?
13       A.    I think I mentioned it to Brian Sullivan,
14   the Athletic Director.
15       Q.    When did you talk to him?
16       A.    I'm in constant contact with him regarding
17   the players that we have. Coach Hurley has me do --
18   you know, wants me to do things that I have to go
19   through Brian for.
20       Q.    Did you talk with him about some of these
21   complaints in the '07-'08 year?
22       A.    Yeah.
23       Q.    Do you recall any specific conversations?
24       A.    There was a lot of them. I mean, the big

Page 81

1    one was with J████.
2        Q.    That's J████ J████?
3        A.    Yes.
4        Q.    And that occurred during the 2008 National
5    Tournament?
6        A.    Yes.
7        Q.    Did you tell him you thought that was
8    related to race discrimination?
9        A.    The financial aid part?
10       Q.    Yes.
11       A.    Yes, I did. I told him, you know, "Why is
12   it, how come every kid here is fine except for J████?
13   Are they trying to make an example out of him? They
14   tried to get him on grade-point average. They couldn't
15   do that, so they're going after financial aid."
16       Q.    Did you have those conversations during
17   the tournament or leading up to the tournament?
18       A.    Before we left.
19       Q.    Did you talk with anybody else about it?
20       A.    No, I don't think so.
21       Q.    Did you talk with Coach Hurley?
22       A.    Yeah. Well, Coach Hurley -- me and Coach
23   Hurley talked all the time, so yes.
24       Q.    So you talked with him during the '07-'08

Page 82

1  season as well?
2    A.  Yeah.
3    Q.  Did you talk about the possibility that
4  this was related to race discrimination?
5    A.  Yes.
6    Q.  Did you talk with anybody else at Clermont
7  College about this?
8    A.  No.  I don't really know anybody else
9  there.
10   Q.  Did you talk with Brian Sullivan about any
11 other incident?
12   A.  Other than J██████?
13   Q.  Right.
14   A.  We talked with Brian before, you know,
15 pretty much everything that we're talking about now.  I
16 mean, he's our Athletic Director.  We have to go
17 through him.
18   Q.  And you would have talked to Brian during
19 the season?
20   A.  Yes.
21   Q.  About all these incidents?
22   A.  Yes, we talked to him about everything.
23   Q.  Did you tell anyone at Clermont that you
24 intended to make a report with main campus at UC?

Page 83

1    A.  I talked to Coach Hurley, and I believe I
2  even mentioned it to Brian.
3    Q.  Would this have been before your
4  interview?
5    A.  I think I may have -- I think I might have
6  interviewed before I called, before I contacted the
7  main campus.
8    Q.  When would you have told Brian Sullivan
9  that you were going to call the main campus?
10   A.  It wasn't very long after, I know -- it
11 wasn't very long after I interviewed, I know that,
12 because my biggest concern -- I even asked him -- I
13 said, "Now, I know you can't really say anything, but
14 how bad -- is this going to affect my hiring?"  And he
15 said, "No, this is totally different."  So (did not
16 finish response) --
17   Q.  During the season, did you tell Sullivan
18 that you might call the main campus?
19   A.  I don't think so.  I don't think so.  I
20 mean, it was a pretty touchy -- it was a difficult
21 season.  There was a lot of things going on, so I don't
22 think I said anything to him about that.
23   Q.  What about right after the season?
24   A.  I don't think so.  I think the only time I

Page 84

1  told him was after -- you know, after I got done
2  interviewing.
3    Q.  Okay.  When was the first time you called
4  the main campus?
5    A.  I don't know, July or -- I can't remember
6  the date.
7    Q.  Was it before or after you interviewed?
8    A.  It was after, because I remember
9  talking -- asking Brian if that was going to hurt my
10 chance of getting the job.
11   Q.  And who did you contact?
12   A.  Karen Faaborg.
13   Q.  Did you know Ms. Faaborg?
14   A.  No.
15   Q.  How did you know to direct your complaints
16 to her?
17   A.  Because I looked on UC's website, and
18 Anthony Perzigian deals with the Clermont campus.  And
19 her office is right there.  It was just a lucky stab on
20 getting ahold of Karen Faaborg.
21   Q.  So did you go to the main campus?
22   A.  No.
23   Q.  You just called?
24   A.  Yes.

Page 85

1    Q.  And how did -- I don't understand.  On the
2  website, you could see that she was --
3    A.  Karen Faaborg was Vice Provost.  I think
4  that was her title.  And, you know, Coach Hurley knew
5  that I was -- that I was going to call down there.  I
6  didn't know who to contact, but I just went on the
7  website and found who was working under Anthony
8  Perzigian's office.  And I tried calling him, but he
9  didn't do -- he said that it's not his responsibility.
10 So I called Karen Faaborg, and she's the one that took
11 care of everything.
12   Q.  You talked to Mr. Perzigian?
13   A.  No, his secretary.  So I talked to --
14   Q.  Did she direct you to call anyone?
15   A.  Karen Faaborg.
16   Q.  You can't remember the first time, the
17 date of the first time you contacted Ms. Faaborg?
18   A.  No, I can't remember offhand.  It was -- I
19 can't remember.
20   Q.  What did you discuss with Ms. Faaborg?
21   A.  Basically just how I felt the kids were
22 treated, weren't treated very well.  You know, I did
23 tell her when I talked to her that I was afraid -- I
24 did just interview for the position, and I was afraid

22 (Pages 82 to 85)

Page 86

1 that it would hurt my chances of actually getting the
2 job.
3    Q.    Did you discuss the substance of your
4 complaints, or just notify her that you had complaints?
5    A.    I just told her I had complaints, and
6 asked her who I needed to talk to. And she asked me if
7 I spoke with anybody at the college yet. And I told
8 her that Dean McDonough wasn't there. And she said
9 that she would call him and set up a meeting and then
10 talk with him.
11    Q.    Did she ask you for names of students?
12    A.    No.
13    Q.    You didn't get that far in the
14 conversation?
15    A.    No.
16    Q.    Did you communicate with her any other
17 times?
18    A.    Other than to get ahold of -- well, she
19 gave me George Wharton's phone number and wanted me to
20 contact him.
21    Q.    And to direct your complaints to him?
22    A.    Yeah, him and Dr. Livingston. Dr.
23 Livingston, I could never get ahold of, and Eric
24 Ambercrombie, I could never get of.

Page 87

1    Q.    You never talked to Dr. --
2    A.    Not Dr. Livingston or Eric Ambercrombie.
3    Q.    Who are those two individuals, do you
4 know?
5    A.    That's just who they said to talk to, they
6 may be able to help. And I never got a chance to talk
7 to them.
8    Q.    Are they at Clermont or --
9    A.    No, they're at the main campus.
10    Q.    George Wharton is the only one you ever
11 spoke to about --
12    A.    Yeah, he's the only one I ever talked to.
13    Q.    And with Karen, you never discussed the
14 specifics of your complaints?
15    A.    No.
16         (Moberly Exhibit No. 7 was marked for
17         identification.)
18    Q.    Do you recognize these emails?
19    A.    (Witness reviewing document). Yes.
20    Q.    You agree that these were sent on June
21 23rd?
22    A.    Yes.
23    Q.    Did you call Karen on June 23rd?
24    A.    I don't know. I can't remember if I did

Page 88

1 or not. I can't even remember why -- I don't know.
2    Q.    If you look at Page -- well, it's the
3 second page of this document. At the top, this is
4 Karen, I think, writing to George Wharton and saying,
5 "Jason Moberly at Clermont has contacted me again about
6 the charge of discrimination he is making and I have
7 urged him to contact you directly." Does that refresh
8 your recollection at all?
9    A.    Yeah, I do remember calling her. She gave
10 me, like I said, those names. And I contacted George
11 Wharton, never got ahold of him, and I went back to
12 Karen to find out what else I needed to do.
13    Q.    Earlier this day, when you received this
14 email?
15    A.    I don't know if it was this day. I can't
16 remember if it was this day or not.
17    Q.    She got back to you -- this is the right
18 day, though, that she got back in contact with you,
19 June 23rd?
20    A.    Yeah, probably.
21    Q.    She directs you to call George Wharton; is
22 that correct?
23    A.    Yes.
24    Q.    Did you call him that day?

Page 89

1    A.    I believe I did, yes.
2    Q.    And was he in his office?
3    A.    Yes, I think so. He either emailed me or
4 called me with his name -- or with his phone number,
5 and I called him on my way home from work.
6    Q.    What did you discuss with Mr. Wharton?
7    A.    I asked him what -- you know, if there was
8 anything that he could do, you know, regarding these
9 matters. And he said that -- or he tried -- he tried
10 to get as much information as he could. So I just gave
11 him all the information that he asked for.
12    Q.    Did you meet with him personally?
13    A.    No.
14    Q.    Did you talk to him just that one time on
15 the phone?
16    A.    A couple of times on the phone, I believe.
17    Q.    This would have been the first time you
18 talked to him, though; is that correct?
19    A.    Probably.
20    Q.    You had not spoken to him before June
21 23rd; is that correct?
22    A.    No.
23    Q.    Do you recall how many times you spoke
24 with Mr. Wharton?

Page 90

1   A.   No, I don't know.
2   Q.   Did you discuss with specificity your
3   concerns about discrimination?
4        MR. MEZIBOV:  Objection to the term
5   "specificity."  You may answer.
6   A.   I think I did.  I think I -- you know, I
7   tried to tell him up to that -- you know, as much as I
8   knew at that point, everything.  I tried to fill him in
9   the best I could.
10  Q.   Did Mr. Wharton ask for the names of
11  students?
12  A.   No.  He said he didn't want them.
13  Q.   He did not want them?
14  A.   No.  That's what he said.  I think I ended
15  up giving them to him, though.
16  Q.   Did you give them to him on the phone?
17  A.   Well, if I gave them to him, it would have
18  been on the phone, because he would never meet me.
19  Q.   Did you ask to meet him?
20  A.   Yes.
21  Q.   And he said he would not meet you?
22  A.   He just never had time.
23  Q.   Did you ask to meet with him in this first
24  call with him?

Page 91

1   A.   I think -- I think I did see if I could
2   come down and meet with him and talk with him about
3   everything, but I think he was -- his schedule was
4   pretty booked up.
5   Q.   Did you discuss the Assistant Basketball
6   Coach position?
7   A.   Yes.
8   Q.   Did Mr. Wharton ask you to do anything?
9   A.   Not other than just try to get everything,
10  any documents or anything that I had, the application,
11  I think, he wanted, and the resume.
12  Q.   Regarding the coaching position; is that
13  right?
14  A.   Yeah.
15  Q.   Did he ask you to write a letter to him?
16  A.   Yes.
17       MR. HOYING:  This is Moberly 8.
18       (Moberly Exhibit No. 8 was marked for
19  identification.)
20  A.   (Witness reviewing document).
21  Q.   Do you recognize this email?
22  A.   Yes.
23  Q.   On the bottom part of the document,
24  that's an e-mail you sent to George Wharton; is

Page 92

1   that correct?
2   A.   Yes.
3   Q.   And he asked you to send him a letter?
4   A.   Yes.
5   Q.   It says, "Attached is the letter you
6   requested.  Also, I've attached a document that I went
7   over with the Dean."
8   A.   Right.
9   Q.   So there were two documents attached to
10  this email?
11  A.   Yes.
12  Q.   What were those two documents?
13  A.   The letter that I wrote to George Wharton,
14  and I had a list of events that I went over with Dean
15  McDonough when I met with him from the previous year
16  and then this past year.  There are a couple of
17  documents I took in for him to see.
18  Q.   You sent this to George Wharton on July
19  2nd, 2008?
20  A.   Yes.
21  Q.   You never sent him a letter before this?
22  A.   No.  He told me he had to have a written
23  complaint or something.
24       MR. HOYING:  This is Moberly 9.

Page 93

1        (Moberly Exhibit No. 9 was marked for
2   identification.)
3   A.   (Witness reviewing document).
4   Q.   Is this a copy of the letter that you
5   wrote to Mr. Wharton?
6   A.   Yes.
7   Q.   Is everything in this letter truthful?
8   A.   Yes.
9   Q.   Okay.
10       MR. HOYING:  And then this is 10.
11       (Moberly Exhibit No. 10 was marked for
12  identification.)
13  A.   (Witness reviewing document).
14  Q.   Is this the list of the allegations that
15  you went over with Dean McDonough?
16  A.   Yes.
17  Q.   And this was also attached to the email
18  that you sent to George Wharton on July 2nd?
19  A.   Yes.
20  Q.   Did you write this list?
21  A.   Yes.
22  Q.   Do you know when you wrote it?
23  A.   It was maybe sometime in June or so, I
24  don't know.

24 (Pages 90 to 93)

Page 94

```
 1   Q.   Did someone ask you to write it?
 2   A.   No, I wrote it.
 3   Q.   You wrote it in anticipation of your
 4  meeting with Dean McDonough; is that correct?
 5   A.   Yes.
 6   Q.   And before that, you had not shown it to
 7  anyone at the University?
 8   A.   I met with Coach Hurley, and that was it.
 9   Q.   Did you show him the list?
10   A.   Yes.
11   Q.   When did you meet with him?
12   A.   I met with him.  I mean, over -- we had
13  open gym, so I mean, I seen him every week.  So it was
14  one of those weeks.
15   Q.   Are all the allegations in the list
16  truthful?
17   A.   Yes.
18   Q.   Allegations from last year appear on the
19  first two pages.  By "last year," are you referring to
20  the 2006-'07 school year?
21   A.   '07-'08.
22   Q.   "Last year" was '07-'08?
23   A.   Yeah.
24   Q.   In Paragraph 1, you say, "Black Assistant
```

Page 95

```
 1  Coach goes to Student Services and then is banned from
 2  the Student Services area."  Who is the Black Assistant
 3  Coach you're referring to?
 4   A.   Anthony Robinson.
 5   Q.   Who is he?
 6   A.   He was the Assistant Coach there at
 7  Clermont before me, and then he ended up leaving.  He's
 8  working, going to school.  So he needed time to do
 9  that.  But he was there, you know, for a few years.  He
10  was there for my first year.  He was also an assistant.
11   Q.   What do you mean he was banned from
12  Student Services?
13   A.   Well, he went down to help -- help some
14  kid get their classes taken care of.  And he come back
15  and he told, you know, Coach Hurley and myself that he
16  was no longer allowed in the Student Service area.  He
17  said, "I was told that we can no longer help students
18  anymore.  We can't help them.  We can't help them sign
19  up for classes.  We can't do nothing."  And he said,
20  "I'm not allowed in the Student Services area."  That's
21  one reason I didn't go down there, because I didn't
22  want to go down there and have the same thing happen to
23  me.  I mean, I don't know what he did or what happened,
24  but I didn't really want to be in that position.
```

Page 96

```
 1   Q.   How do you know this happened to him?
 2   A.   He came up and told Coach Hurley and
 3  myself, and Brian even told us not to send him back
 4  down there, or he told Coach Hurley not to have him go
 5  back.
 6   Q.   In Paragraph 2, you talk about the student
 7  who missed the National Tournament.  What student are
 8  you referring to?
 9   A.   J██████ J█████.
10   Q.   In Paragraph 3, you talk about the
11  academic requirements changing.  First of all, what is
12  "ORCC"?
13   A.   The Ohio Regional Campus Conference.
14   Q.   Okay.  And then "USCAA," you're not sure?
15  Do you recall what that is?
16   A.   United States College Athletic
17  Association.
18   Q.   Okay.  And Clermont is a member of both
19  conferences?
20   A.   Yes.
21   Q.   Are they conferences?
22   A.   They're organizations.
23   Q.   All of the players were eligible under
24  their requirements?
```

Page 97

```
 1   A.   Yes.
 2   Q.   I can't remember.  Did you say Clermont
 3  had -- what was Clermont's eligibility requirement?
 4   A.   Clermont's -- it depends.  You know, this
 5  year, it was a 2.0, 36 credit hours straight across the
 6  board.  But if we follow the rules by them, for
 7  incoming freshmen, it's dropped, so they don't have to
 8  take -- or pass 12 credit hours.  So I mean, I think --
 9  I think, starting this year, we will actually be
10  following the rules, eligibility-wise.
11   Q.   Those eligibility requirements apply to
12  both Black and White players, right?
13   A.   Yes.
14   Q.   Clermont's eligibility requirements apply
15  to both Black and White?
16   A.   Yes.
17   Q.   In Paragraph 4, you talk about S███
18  D███.  The last sentence you say, "S███ has his
19  concerns."  What were S███'s concerns?
20   A.   (Witness reviewing document).
21   Q.   Take your time.
22   A.   (Witness reviewing document).  That's
23  between S███ and his brother.  His brother is real
24  close to the University, and he works for the Better
```

25 (Pages 94 to 97)

Page 98

1 Business Bureau and has a couple of the Board members
2 on his board. And that's between him and his brother.
3    Q.   Did S████ and his brother have concerns
4 about his basketball number been retired?
5    A.   I don't know what that was. That's
6 between him and his brother. So I don't know exactly
7 what it was. He told me a little bit, but I didn't
8 quite follow what he was saying. I didn't understand
9 it.
10    Q.   What did he tell you?
11    A.   Well, I mean, one of it was with his
12 brother, and then also how he just felt that his
13 experience at Clermont was -- he said, "My experience
14 at Clermont, the best I can say is I got an education."
15 He said, "As far as that goes," he said, "I will never
16 send anybody back." And then that's mainly what he had
17 with his brother, and I don't know what that was.
18    Q.   So it's possible that S███ did not want
19 his jersey retired?
20    A.   No.
21          MR. MEZIBOV: Objection.
22    A.   He wanted his number retired. I mean,
23 we've already discussed that he did.
24    Q.   In Paragraph 6, the student with the

Page 99

1 learning disability, who are you referring to?
2    A.   R███ S████.
3    Q.   Paragraph 7, who is the person who works
4 at the college who overheard members of the college
5 team called "stupid," "dumb," and "worthless"?
6    A.   I believe that was Monica Johnson.
7    Q.   She's the person who overheard the
8 comments?
9    A.   Yes.
10    Q.   Who are the people who made the comments?
11    A.   I don't know. She's no longer employed,
12 so (did not finish response) --
13    Q.   In Paragraph 8, "It was even brought to
14 the attention of the players that some in the Students
15 Service area treated Whites different than Blacks, this
16 coming from an employee that works at the college."
17    A.   That was Monica Johnson as well.
18    Q.   Did you talk to Monica Johnson?
19    A.   No, she was -- I tried to get her number,
20 but every number I've tried -- I just had her email
21 address, which is no longer in use, or her --
22 obviously, she don't have her office number. I don't
23 know how else to get ahold of her.
24    Q.   Have you ever talked to her?

Page 100

1    A.   No. S████ has talked with her, and he
2 was supposed to get me her number at one time, but he
3 was a little busy with other things at the time.
4    Q.   Okay. Allegations from this year -- when
5 you say "this year," what year are you referring to?
6    A.   Probably the '09, summer of '09.
7    Q.   Summer of '09 or summer of '08?
8 Summer '09 is upcoming.
9    A.   '08.
10    Q.   '08. Then the '08-'09 basketball season?
11    A.   Yeah.
12    Q.   In Paragraph 4, you say, "The reason it is
13 retaliation is because the girls coach sent a letter
14 stating problems with the Student Services last year
15 and nothing was done to him." Who is the girls coach
16 you're referring to?
17    A.   Mike Matthews.
18    Q.   What kind of letter did he send?
19    A.   He just sent pretty much the same thing,
20 that he had problems, you know, with how some of the --
21 I guess, getting classes scheduled or something. He
22 sent a letter in, and basically nothing was ever done
23 about it. And I asked him, you know, if he had -- he
24 said he still had a copy of it, but -- I don't have it.

Page 101

1    Q.   Have you ever seen it?
2    A.   No.
3    Q.   Is he still the Girls Basketball Coach.
4    A.   Yes.
5    Q.   Anything done to him?
6    A.   No.
7    Q.   In Paragraph 6, you talk about a local kid
8 who asked about coming to Clermont. What's the local
9 kid's name?
10    A.   What is his name? I can't remember his
11 name. M████ S████.
12    Q.   How did this M███ S███ know about the
13 student who wasn't allowed to participate in the
14 National Tournament?
15    A.   They were best friends.
16    Q.   Who was?
17    A.   J████ J████ and M███ S███ are good
18 friends, and a lot of the kids from around Cincinnati,
19 they all talk.
20    Q.   In Paragraph 10, you say, "At the banquet
21 after the men's and women's basketball team, both come
22 back from the National Tournament, those players
23 received a slap in the face when they were told that
24 more concentration was going to be on intramurals."

Page 102

1   Who said that?
2        A.   I believe that was Ms. Appleton, and also
3   Phil Sinkovich, who happened to be the AD there, agreed
4   that was just ridiculous.
5        Q.   Who used to be the AD?
6        A.   Phil Sinkovich.  And Brian mentioned, this
7   year, they want to put a little more emphasis on
8   intramurals than the athletics.
9        Q.   Why is that a slap in the face?
10       A.   You can't run intramurals with nobody
11  staying on campus.
12       Q.   Why is that a slap in the face to the
13  athletes?
14       A.   It's basically telling you that the
15  athletes aren't worthy enough, we're going to run
16  intramural sports, and athletes are going to be second,
17  and we're going to push you aside.  That's how these
18  kids feel.
19       Q.   Were you also upset by that?
20       A.   Oh, yeah.
21       Q.   Was Coach Hurley upset by that?
22       A.   Very much.
23       Q.   Is there a sense among the Clermont
24  administration that athletics are not important?

Page 103

1        A.   Yes, we believe that.
2        Q.   Who do you get that sense from?
3        A.   Well, pretty much everybody.  We've never
4   had any meetings with any -- we're not allowed to have
5   any coaches meetings, so how do we know what happened?
6   We've got one this year, the first time in two years.
7   What other college goes through without having any
8   coaches meetings to let their coaches know what's going
9   on in the Athletic Department?  None.  High School
10  coaches do it.  Clermont, this is the first time in two
11  years.
12       Q.   Who are the people that -- I mean, are
13  there individuals in the administration that give you
14  that sense?
15       A.   You know, Kim give me that sense.
16       Q.   Kim Allison?
17       A.   Yes.
18       Q.   Anyone else?
19       A.   No, not as much.
20       Q.   Dean McDonough?
21       A.   No, I don't think so.
22            MR. MEZIBOV:  Could we take a necessary
23  break?
24            MR. HOYING:  Sure.

Page 104

1            (At which time, a recess was taken from
2            11:24 a.m. until 11:29 a.m.)
3            (At which time, a luncheon recess was
4            taken from 11:30 a.m. until 12:16 p.m.)
5        Q.   So we were discussing Moberly Deposition
6   Exhibit 10, which is your list of alleged incidents of
7   discrimination.  You said you had also discussed that
8   with Dean McDonough; is that correct?
9        A.   Yes.
10       Q.   How did you contact Dean McDonough?
11       A.   I either called him or sent an email.  I
12  can't remember which.  It may have been both.  But he
13  had some free time, and I met with him at that time to
14  go over this.
15       Q.   Did Karen Faaborg say that you should
16  contact Dean McDonough?
17       A.   Yes, she suggested I contact him.
18            MR. HOYING:  Mark this as Moberly
19  Deposition Exhibit 11.
20            (Moberly Exhibit No. 11 was marked for
21            identification.)
22       Q.   Is this an email that you sent to Dean
23  McDonough?
24       A.   Yes.

Page 105

1        Q.   And this is on June 25th; is that
2   accurate?
3        A.   Yes.
4        Q.   It looks like on the first line you're
5   introducing yourself.  You say, "My name is Jason
6   Moberly."  You had not spoken to Dean McDonough in the
7   past?
8        A.   No, I didn't really know who anybody was
9   there.
10       Q.   So you had never really spoke to him --
11       A.   No.
12       Q.   -- before June 25th?
13       A.   Right.
14       Q.   Did you meet with him?
15       A.   I did meet with Dean McDonough.
16       Q.   Do you know when?
17       A.   It was later -- I don't know if it was
18  June or early July.
19       Q.   It would have been after you sent this
20  June 25th email; is that correct?
21       A.   Yes.
22       Q.   And what did you discuss with him?
23       A.   Oh, I brought -- I took this paper in
24  (indicating).

Page 106

1    Q.    You're referring to the Moberly Exhibit?
2    A.    10.
3    Q.    10.
4    A.    And we went over it and, you know, he said
5  he was going to check into a lot of the stuff that I
6  brought up, and he was going to look into it.
7    Q.    Do you know if he did look into it?
8    A.    I don't know. I think he went on another
9  vacation afterwards.
10   Q.    Did you discuss the coaching position with
11 Dean McDonough?
12   A.    I think so. Well, it was mainly the
13 concern about -- I didn't understand why I had to apply
14 for the job again when -- you know, I kind of just
15 assumed that I already had it the year before. I mean,
16 I was getting paid, even though it was through a temp
17 service, and I had, you know, the title of Assistant
18 Coach, you know. And then, by not getting -- you know,
19 my experience outweighs everybody else's that even
20 applied for it. I didn't understand why I never got
21 the job.
22   Q.    Did you threaten to sue Clermont if you
23 did not receive the coaching position?
24   A.    No. I think it was more -- once I found

Page 107

1  out the reasons why I didn't get it, didn't get the
2  Coach's position, then that's when I felt that there
3  was a problem.
4    Q.    Did you tell him that you had retained an
5  attorney?
6    A.    I think I mentioned it to him.
7    Q.    What did you tell him?
8    A.    Just that I've -- I have an attorney
9  that -- he said -- you know, I had an attorney to
10 discuss anything that -- you know, to help me with the
11 job, you know, to just kind of help me in regards to if
12 there was anything that I could do to keep my job, or
13 at least get it, so (did not finish response) --
14   Q.    Did you leave him with the impression
15 that, if you did not get the job, you would sue
16 Clermont?
17   A.    I don't know what impression he got from
18 it, but I know -- I tried to make it a point that I
19 wasn't real happy with the fact that -- and I think
20 this might have been after I found out I didn't get the
21 job. He knew that I wasn't real happy with it, and
22 especially the determining cause of who was supposed to
23 be hired over top and how they came to that conclusion.
24   Q.    Did you tell him that you planned to talk

Page 108

1  to the NAACP?
2    A.    I think I even sent him an email regarding
3  that. I think I have an email to him regarding the
4  NAACP.
5    Q.    In your conversation with him, did you
6  tell him you were?
7    A.    I probably have. It's been last summer.
8    Q.    What did you tell him you were going to
9  tell the NAACP?
10   A.    Well, that we could get the NAACP -- I did
11 talk with the NAACP, and they wanted me to write him a
12 letter. And I kind of wanted to deal with -- I kind of
13 wanted to get it settled before it got to that point.
14 I didn't want to bring the NAACP in if they didn't have
15 to be brought in. And I was hoping that by meeting
16 Dean McDonough, we would get a lot of this settled so
17 we wouldn't have to worry about moving on. And I never
18 did call him. Actually, I sent him a letter, and I
19 talked to him. And they actually had -- they already
20 knew -- they were already aware of the problems.
21   Q.    Did you have any other correspondence with
22 the NAACP?
23   A.    No.
24   Q.    Just that one letter you sent?

Page 109

1    A.    Yeah.
2    Q.    And who did you talk to at the NAACP?
3    A.    It was one of the secretaries there. I
4  don't know her name. I don't know who she was.
5    Q.    Where did you get the number?
6    A.    It was off their website.
7          MR. HOYING: This is Moberly Deposition
8  Exhibit 12.
9          (Moberly Exhibit No. 12 was marked for
10         identification.)
11   A.    (Witness reviewing document).
12   Q.    Is this an email that you sent to Dean
13 McDonough after your meeting with him?
14   A.    Yes.
15   Q.    And this email was on June 27th, 2008?
16   A.    Yes.
17   Q.    So your meeting with Dean McDonough would
18 have been sometime between June 25th and June 27th?
19   A.    Yeah, I think it was -- yeah, it was the
20 26th.
21   Q.    And at this time, you knew that you were
22 not the first choice for the coaching position; is that
23 correct?
24   A.    Right, I believe so.

Page 110

1      Q.    I direct your attention to the bottom of
2   the second paragraph, the last sentence. It says, "I
3   would also like to know how my coaching position is
4   coming because I can either move on to another college
5   or I can get in touch again with Mr. Wharton at the
6   main campus, and my lawyer to see what other actions
7   need to be done." What did you mean by "other actions
8   need to be done"?
9      A.    Well, after speaking with Coach Hurley and
10  Brian Sullivan, from listening to both of them and
11  hearing from both of their mouths that I was going to
12  get the job, that's two to one on the hiring. So when
13  I found out I didn't get the job, I definitely was not
14  real happy about it.
15     Q.    By "other actions," did you mean to inform
16  Dean McDonough that you intended to file a lawsuit?
17     A.    Well, that I would speak with my attorney
18  and see what was necessary.
19     Q.    Other than Mr. Wharton, Ms. Faaborg, and
20  Dean McDonough, did you ever file any other complaints
21  with the University about discrimination?
22     A.    No, I didn't.
23     Q.    Did you ever speak with anyone else?
24     A.    To file a complaint or --

Page 111

1      Q.    Did you speak with anyone else about your
2   complaints regarding discrimination?
3      A.    No.
4      Q.    When did you learn that you needed to
5   apply for the assistant coaching position?
6      A.    It was in -- I believe in the spring of
7   last season, of the 2008 season.
8      Q.    2007-2008 season?
9      A.    Yeah.
10     Q.    Who told you?
11     A.    Brian Sullivan.
12     Q.    And what did he tell you?
13     A.    He told me that I had to re-apply for the
14  -- or I had to apply for the position, it's just a
15  formality, to go ahead and apply, and he'd get it
16  pushed through as soon as possible.
17     Q.    Did he say you needed to submit an
18  application and resume?
19     A.    Yes.
20     Q.    And did you submit an application and
21  resume?
22     A.    I couldn't at first because of the one --
23  the previous year was still on the website, which you
24  have. And they said not to worry about it, they just

Page 112

1   wanted to use that one, which none of it was updated,
2   because there was a year's worth that was missing off
3   of it.
4            (Reference to previously-marked Moberly
5            Exhibit Nos. 4 and 5.)
6      Q.    So you're referring to -- I think you
7   still have it in front of you -- Deposition Exhibit 4,
8   which is your resume, and Exhibit 5, which is the
9   application you filled out the year before; is that
10  right?
11     A.    Yes.
12     Q.    Did you ask to resubmit a new application
13  or resume?
14     A.    Yeah. Brian said not to worry about it --
15  well, he knew I wasn't real happy that I had to apply
16  for the job in the first place. And he said, "Don't
17  worry about it." And Coach Hurley told me the same
18  thing, "It's a formality. We just need people to
19  interview, because that's what the University wants.
20  We need three people. We'll shut it down after three
21  people. You'll be fine. You've already been here."
22     Q.    Who told you that?
23     A.    That's what Brian and Coach Hurley both
24  told me.

Page 113

1      Q.    Did you ever fill out a different
2   application?
3      A.    I just filled out the one that they gave
4   me -- or that I did online. Mine is different than
5   what theirs was, though.
6      Q.    Do you have a copy of the one you filled
7   out?
8      A.    I think I got it from -- I think I've got
9   it in all this paperwork. I don't know if I've ever
10  gotten it from the college, but I think I did end up
11  getting one.
12            Actually, I don't think I did get the one
13  from 2008 or 2000 -- yeah, the 2008 one, because they
14  told me not to worry about it, they just wanted to use
15  that one.
16     Q.    So you think you do have a copy of the
17  more recent?
18     A.    No.
19     Q.    You think you do not?
20     A.    No. They told me they were going to use
21  that one.
22     Q.    They were going the use?
23     A.    The one that was a year old.
24     Q.    Moberly Deposition Exhibit No. 5?

Page 114

1    A.    Right.
2    Q.    I'm asking, does another different draft
3 exist?
4    A.    Not that I know of.
5    Q.    But you never filled out a second
6 application, then?
7    A.    No, I couldn't.  I couldn't, because you
8 had to do it all online.  And that was the one -- they
9 wouldn't let me fill out another one because that one
10 was already online.
11    Q.    Would any of your answers have changed had
12 you had filled it out in 2008?
13    A.    Oh, yeah.  I would have put on there that
14 I was the Assistant Coach for Clermont the previous
15 year, and everything I did there under Coach Hurley,
16 and, you know, updated my jobs -- or my job at Siemens
17 and my job at Clermont.
18    Q.    And you're referring to your resume,
19 Moberly Deposition Exhibit No. 4?
20    A.    Right.  All of that would have been
21 updated.
22    Q.    You still serve as Helpdesk Technician,
23 right?
24    A.    Right, but I have other stuff I do now

Page 115

1 after being there for a year.
2    Q.    And you would have had the coaching job
3 at --
4    A.    Clermont.
5    Q.    -- clermont?
6    A.    Plus a semi-pro team I was coaching.
7    Q.    What team was that?
8    A.    It's a semi-pro team in Milford.
9    Q.    What team?
10    A.    It's the Milford Generals.  It's a new
11 team over the summer, to help kids gain contracts to
12 play overseas.
13    Q.    When did you start coaching for them?
14    A.    Well, we had the team in place that
15 previous year.  So we were trying to get guys to play
16 for us all season.  So probably the year before --
17 well, that year, I knew that we'd be coaching, I'd be
18 coaching on that team.  So the 2008 season, I knew I'd
19 be coaching that team -- or Assistant Coach of that
20 team.
21    Q.    What month in 2008?
22    A.    It was over the summer, maybe -- maybe
23 April or May.
24    Q.    And did you apply for that position?

Page 116

1    A.    No.  They just -- they wanted me to do it,
2 so I did.
3    Q.    Were you the Head Coach?
4    A.    No, I was just an assistant.
5    Q.    Do you get paid for that?
6    A.    No.
7    Q.    It's a semi-pro team?
8    A.    Yeah.
9    Q.    What does that mean?
10    A.    We play 10 games.  They're all on
11 Saturdays.  And these kids go to play overseas, whether
12 it be Germany or Europe or Brazil or wherever.
13    Q.    They play 10 games where?  In Cincinnati?
14    A.    Well, we go to Lexington.
15    Q.    Okay.
16    A.    We go to Louisville, Clermont County.
17 Milford is our home court, so (did not finish
18 response) --
19    Q.    And I think you referred to them as kids.
20 They're paid?
21    A.    No, they're -- no, ours aren't paid.
22 These guys are people who graduated from college
23 already, who have already played four years, or has
24 been at a big university.

Page 117

1    Q.    And they're unpaid?
2    A.    Right.
3    Q.    So when you say "semi-pro," it's because
4 they may be paid?  They may be allowed to be paid by
5 other teams, but they're not paid by Milford; is that
6 correct?
7    A.    Right.
8    Q.    Okay.  Who manages the team?
9    A.    Rick Kohler is our General Manager.
10    Q.    And you're an Assistant Coach?
11    A.    Yes.
12    Q.    Did you play any games during -- when did
13 the season take place?
14    A.    It's like early -- I think it's like
15 either May or late April.  I think May.  It has to be
16 the middle of April or so, because we play 10 games
17 every Saturday.
18    Q.    You play 10 games every Saturday?
19    A.    We play 10 games altogether, but they're
20 only played on Saturdays.
21    Q.    And did you play any games in 2008?
22    A.    No.
23    Q.    So this was the first season?
24    A.    2009 is the first season.

Page 118

1    Q.    Any other experience that's not on your
2  resume that would have been if you had had an
3  opportunity to submit an updated resume?
4    A.    **Not that I can think of, no.**
5    Q.    Did Coach Hurley know that you were
6  involved in coaching the Milford Generals?
7    A.    **We coached together.**
8    Q.    Oh, he's the Head Coach?
9    A.    **Yes.**
10   Q.    Did Brian Sullivan know that also?
11   A.    **Yes.**
12   Q.    Did you interview for the position of
13 Assistant Coach?
14   A.    **Yes.**
15   Q.    And when was that?  When was your
16 interview?
17   A.    **I don't know.  I don't know if it was**
18 **early June or middle.  I don't know.  It was -- I can't**
19 **remember.**
20   Q.    Whom did you interview with?
21   A.    **Coach Hurley, Kim Ellison, and Brian**
22 **Sullivan.**
23   Q.    Where did the interview take place?
24   A.    **At the college, in Kim Ellison's office.**

Page 119

1    Q.    What was discussed during the interview?
2    A.    **Well, just previous coaching experience,**
3  **you know, about recruiting, fundraisers.  That's pretty**
4  **much it, just about.**
5    Q.    Anyone express concern that you did not
6  have a four-year degree?
7    A.    **No.**
8    Q.    Any way for you to know what date that
9  interview was?
10   A.    **Yeah.  If I look through here**
11 **(indicating), I might be able to find it.  (Witness**
12 **reviewing document).**
13   Q.    I tell you what, we'll come back to that.
14 We'll come back to that.
15         (Reference to previously-marked Moberly
16         Exhibit No. 6.)
17   Q.    If you can turn to your Complaint, which
18 is Moberly Deposition Exhibit 6.
19   A.    **(Witness reviewing document).**
20   Q.    Paragraph 12 -- it's on Page 4.
21   A.    **(Witness reviewing document).**
22   Q.    The last sentence of that paragraph says,
23 "Following the interview, Plaintiff was informed that
24 the vote had been unanimous in re-hiring Plaintiff to

Page 120

1  coach another year."  Who informed you of that?
2    A.    **Coach Hurley.**
3    Q.    How?
4    A.    **He called me and told me.**
5    Q.    Was it immediately following your
6  interview?
7    A.    **I don't think it was immediately.  I think**
8  **it may have been the next day or so.**
9    Q.    Did he tell you anything else?
10   A.    **No, other than -- no, only that they were**
11 **looking to hire me.**
12   Q.    So when you spoke to him, he did not offer
13 you the job; is that correct?
14   A.    **Right.**
15   Q.    You understood that the hiring process was
16 not complete?
17   A.    **I was the last one to interview, so I**
18 **figured it was probably winding down.  So I figured,**
19 **with me being the last one, then it was about complete.**
20   Q.    No one else from Clermont offered you the
21 job in June of 2008, did they?
22   A.    **No.**
23   Q.    Any other reason, other than that phone
24 call, that you believed that you would receive the

Page 121

1  coaching position?
2    A.    **Before I even applied for it, Brian**
3  **Sullivan and Coach Hurley told me that it was a**
4  **formality and, you know, I should end up with the**
5  **position, more than likely I will, because, I mean,**
6  **they were two of them that were on the hiring**
7  **committee.**
8    Q.    Any other reason?
9    A.    **Well, Coach Hurley told me that it was --**
10 **you know, that it was his vote, basically everything**
11 **come down to him, and he chose me, and then figured**
12 **that wasn't good enough, so they decided to go another**
13 **way, so (did not finish response) --**
14   Q.    When did Coach Hurley tell you that it was
15 all that mattered that he wanted you?
16   A.    **I think after he told me that I wasn't**
17 **going to get the job, because Coach Hurley was the one**
18 **who had to tell me, because nobody else did.**
19         **Yeah, I think that's -- yeah, he told me**
20 **that I didn't get the position, and he told me that it**
21 **was, you know -- actually, Brian, Brian Sullivan, I**
22 **talked to him on the phone.  And he even told me that**
23 **it was left up to Coach Hurley and he chose me, and**
24 **then they decided to go away from that.  So after he**

31 (Pages 118 to 121)

Page 122

1  was told to -- you know, "If that's who you want, then
2  that's fine." He decided that I was the one he wanted.
3  And then it was like, "Well, we changed our mind, we're
4  going to go in a different direction."
5      Q.   Who changed their mind?
6      A.   Well, they told me that Kim was the one
7  that changed her mind, so I wasn't in the — I wasn't
8  in there, so I can't tell you for sure. But that's
9  what Brian and Coach Hurley both told me.
10     Q.   Any other reason that you thought you'd
11 receive the coaching position?
12     A.   I was more qualified than anybody else
13 that even applied for the position, and Coach Hurley
14 has even told me that.
15     Q.   How do you know who else applied for the
16 position?
17     A.   Because they told me.
18     Q.   Who is "they"?
19     A.   Well, Brian told me, and Coach Hurley told
20 me. Of course, it was all after the fact of when they
21 told me I wasn't going to get the job.
22     Q.   Okay. So when you were in the interview
23 process, you didn't know --
24     A.   No.

Page 123

1      Q.   -- who else was applying?
2      A.   No. I knew one of them, because I coached
3  against him. And he was there at the college. I mean,
4  what other reason would he be there?
5      Q.   Who is that?
6      A.   Melvin Levitt.
7      Q.   So you knew he was applying. Did you know
8  anyone else was applying?
9      A.   No. They didn't tell me their names.
10 They just said they had three people, they had to get
11 three people in order to close it.
12     Q.   So you couldn't have known what the
13 qualifications of the other candidates were during the
14 interview process, then; is that right?
15     A.   No, but I mean, I've been around this type
16 of basketball at this level long enough to realize
17 you're not going to get somebody in that has really
18 great qualifications to take a position, Assistant
19 Coaching position that only pays $2,000. Basically,
20 you pay them to coach, with all the money you lose.
21     Q.   Any other reason that you thought you'd
22 get the coaching position?
23     A.   I had it the year before. I mean, I was
24 coaching there the year before. There was never any

Page 124

1  problems with me. I didn't know why there would even
2  be any questions asked.
3      Q.   Any other reasons?
4      A.   Not that I can think of.
5      Q.   When did you become concerned that you
6  might not be the first choice for the coaching
7  position?
8      A.   Well, probably up to the day that Coach
9  Hurley come in and told me they decided to go with
10 somebody else. I mean, the whole time I was just under
11 the impression that it was going to be me, from him and
12 Brian both. I mean, two of the people that did the
13 interviewing told me that I was going to be the one.
14     Q.   Had you talked to Coach Hurley between the
15 time when he told you that you were the choice until
16 the time that he told you you weren't getting the
17 position?
18     A.   I probably -- I'm probably sure I have. I
19 mean, I talk to Coach Hurley every day.
20     Q.   Did he ever tell you that the committee
21 might make a different decision?
22     A.   Well, he told me that, you know, that
23 things have come up after -- you know, during the
24 interview process that, once I was done, that they

Page 125

1  wanted to go back through and look at somebody else
2  that didn't have all their stuff on their resume. So
3  they went back and called them to find out more
4  information. Nobody ever called me to find out more
5  information. I mean, I coached semi-pro. They didn't
6  know that.
7      Q.   Did you --
8      A.   I was going to coach, but nobody called me
9  to tell me -- or to ask me.
10     Q.   You knew the University was following up
11 with the other candidates, though?
12     A.   Yeah, one of them.
13     Q.   Anyone ever tell you that the position was
14 under-utilized?
15     A.   What do you mean "under-utilized"?
16     Q.   Did anyone ever tell you that?
17     A.   What do you mean "under-utilized"? As in
18 what?
19     Q.   I'm asking you, do you know what that term
20 means with respect to the coaching position?
21     A.   No.
22     Q.   Or did you --
23     A.   I don't know what you mean.
24     Q.   And no one ever told you that it was an

32 (Pages 122 to 125)

Page 126

1  under-utilized position?
2      A.   Not that I can remember.
3      Q.   Were you concerned that you might not be
4  the first choice for the coaching position when you
5  contacted Karen Faaborg?
6      A.   Yes.
7      Q.   Did you tell her that you were concerned?
8      A.   Yes.
9      Q.   And this was before you knew the position
10  was going to be offered to another candidate?
11      A.   Right.
12      Q.   When did you learn that you would not be
13  offered the coaching position?
14      A.   I think it may have been sometime in July,
15  early part of July. All I can remember is, I was -- we
16  had open gym that night, and that's where Coach Hurley
17  told me. And he told me that, you know, he didn't
18  agree, and I wasn't really happy.
19      Q.   Let me take you back to -- well,
20  Deposition Exhibit 23 (sic).
21      A.   (Witness reviewing document.)
22          (Reference to previously-marked Moberly
23          Exhibit No. 7.)
24      Q.   I'm sorry, it was on June 23rd.

Page 127

1  Deposition Exhibit No. 7.
2      A.   (Witness reviewing document.)
3      Q.   If you recall this, this is the
4  correspondence between you and Karen Faaborg and George
5  Wharton. Did you call Ms. Faaborg on June 23rd because
6  you knew you hadn't received the coaching position?
7      A.   I don't know if it was -- no, I don't
8  think that it was even decided. It couldn't have been,
9  because I told Karen that the biggest problem I had was
10  the fact that I may not even be considered for a job
11  now after calling and placing the -- you know, calling
12  about the discrimination.
13          (Reference to previously-marked Moberly
14          Exhibit No. 11.)
15      Q.   Let me take you to Deposition Exhibit 11.
16      A.   (Witness reviewing document.)
17      Q.   That's your June 25th email to Dean
18  McDonough. At this time, you knew that the position
19  was not going to be offered to you; isn't that correct?
20      A.   Well, I don't know. I think this was more
21  just the fact that I was a little ticked off about
22  having to go through an interview process when I've
23  already coached there.
24      Q.   Let me refer you to the second line, "Last

Page 128

1  year I was the assistant and this year I was not given
2  the position."
3      A.   I wasn't given the position right out. I
4  had to re-apply for it, go through a whole interview
5  process after holding the position the year before.
6      Q.   So you don't know whether --
7      A.   I don't think that -- I think this was
8  before I found out that I wasn't going to have the job.
9  I'm almost positive.
10      Q.   When you talked to Dean McDonough, did you
11  know that you weren't getting the job?
12      A.   This time -- no, I had a pretty good idea
13  that something was going to happen, just because I did
14  call the main campus.
15      Q.   But didn't you tell Dean McDonough that
16  you had hired a lawyer and that you might get the
17  lawyer involved?
18      A.   That I was looking to have an attorney and
19  that I did actually have one, and I had a good idea
20  that something was going to happen. So I'm glad I
21  actually did have an attorney, because if I wouldn't
22  have, then, I mean, I wouldn't be here now.
23          I probably did have one then. I know I
24  was talking to quite a few of them, quite a few

Page 129

1  attorneys before all this hit, so (did not finish
2  response).
3      Q.   So you started talking to attorneys before
4  you even knew if you had gotten the job?
5      A.   Well, when you call the main campus
6  regarding -- I've been involved at the college
7  for -- not just at Clermont, but even Southern State,
8  for 10 years. I could -- colleges and academics,
9  probably more than ever, that's where somebody is going
10  to stab you in the back more than any other business.
11  I mean, my whole family is involved in education. You
12  don't have anybody in education that tells the truth.
13  So I was preparing myself just in case. I've been
14  involved in it. I've seen what happens. I wasn't
15  going to go down like everybody else.
16      Q.   You were preparing yourself by making a
17  complaint?
18      A.   I was preparing myself that way. If it
19  did come to where we are now, I would have somebody
20  here with me.
21      Q.   If you didn't get the job?
22      A.   Well, I was retaliated against, so that
23  was my complaint.
24      Q.   You thought, if you didn't get the job,

Page 130

1  you could say, "I made a complaint," and then show that
2  that was retaliation; is that right?
3          MR. MEZIBOV: Objection. You can answer.
4      A.   Well, I -- there's a lot that went into
5  the Complaint regarding racism. You know, I know I'm
6  different than almost anybody else in this room. Those
7  kids mean a lot to me. When I seen that they were
8  treated bad, I made my point, and then I was the one
9  that suffered the consequences regarding the job.
10     Q.   Was your Complaint made to protect
11  yourself in case you might not get the job?
12     A.   No. It was more the fact that, when you
13  have a kid crying because he doesn't get the help that
14  he deserves, that seems to be a problem with me. And
15  that's -- that was my biggest complaint.
16     Q.   It came into your mind that you might not
17  get the job?
18          MR. MEZIBOV: Objection. It's
19  argumentative at this point. You can answer.
20     A.   Well, I mean, anybody who goes against
21  their employer will probably, nine out of ten times,
22  not have a job, so (did not finish response) -- I mean,
23  I would get an attorney to help protect me.
24     Q.   Did you tell your colleagues at Clermont

Page 131

1  that you had hired an attorney and had contacted the
2  main campus, other than Dean McDonough?
3      A.   Brian Sullivan and Coach Hurley knew.
4      Q.   You had not yet spoken to George Wharton
5  when you learned that you would not get the job; is
6  that right?
7      A.   I don't believe so. I think -- I think I
8  had to -- I spoke with him afterwards, because I spoke
9  with him regarding the retaliation. So it had to have
10  been afterwards.
11     Q.   That was a poorly worded question. So you
12  found out that you did not get the job, and then
13  subsequently you talked to George Wharton?
14     A.   Right.
15     Q.   Is that correct?
16     A.   Yeah.
17          (Reference to previously-marked Moberly
18           Exhibit No. 6.)
19     Q.   If you can look at your Complaint again,
20  if you still have that.
21     A.   (Witness reviewing document).
22     Q.   Paragraph 14.
23     A.   (Witness reviewing document).
24     Q.   Mr. Hurley informed you -- I'm sorry, you

Page 132

1  say you overheard Brian -- let me ask one more time.
2  You say that Brian Sullivan overheard Ms. Ellison say
3  that you were not offered the position because you
4  contacted the main campus; is that correct?
5      A.   Yes.
6      Q.   Did Mr. Sullivan tell you that he had
7  overheard Ms. Ellison make this comment?
8      A.   Coach Hurley was actually on a three-way
9  call with both of them, and he's the one that informed
10  me of it.
11     Q.   Mr. Hurley also informed you that the
12  position was going to be offered to another candidate?
13     A.   Yes.
14     Q.   Do you recall if that occurred on June
15  23rd?
16     A.   It could have. I don't know for sure.
17     Q.   Did Mr. Hurley say anything else?
18     A.   Well, he told me that it was -- that it
19  came down to -- seeing how he's the Head Basketball
20  Coach, both Kim and Brian deferred the hiring process
21  to him, and that I was his number-one choice because he
22  was the Head Basketball Coach, that I would be working
23  for him, and then it was all -- it was changed after
24  that.

Page 133

1      Q.   Did he say he'd continue to support you
2  for the position?
3      A.   Yes.
4      Q.   Did anyone else ever tell you that you
5  were not hired because you contacted the main campus?
6      A.   No.
7      Q.   Anyone else say that you were not hired
8  because you complained about discrimination?
9      A.   No, I don't think so.
10     Q.   You also say that Brian Sullivan continued
11  to support you for the position; is that correct?
12     A.   Yes.
13     Q.   Did Mr. Sullivan ever tell you that he
14  supported you for the position?
15     A.   Yes.
16     Q.   After the decision was made to hire a
17  different candidate?
18     A.   Yes.
19     Q.   When did he tell you that?
20     A.   Up to the point that I actually signed the
21  contract in October, he said that he always -- he
22  always supported -- him and Coach Hurley were always
23  behind me getting this position.
24     Q.   Paragraph 16 says, "Mr. Hurley confirmed

34 (Pages 130 to 133)

Page 134

1  on July 1, 2008 that the position was being offered to
2  another candidate." Did he tell you who the other
3  candidate was?
4      A.    I think he may have. Yeah, he did tell me
5  who it was.
6      Q.    Who was the other candidate?
7      A.    Keith Starks.
8      Q.    Did you know Mr. Starks?
9      A.    No, Coach Hurley did.
10     Q.    Is he Black or White?
11     A.    He was Black.
12     Q.    Did you ever talk with Mr. Starks?
13     A.    No.
14     Q.    You've never talked to him?
15     A.    No, he's never -- he never showed up on
16  campus. Nobody ever talked to him.
17     Q.    Did you talk to him on the phone?
18     A.    No.
19     Q.    Did Mr. Hurley tell you that he thought
20  Mr. Starks had objectively inferior qualifications?
21     A.    No, no.
22     Q.    He never told you that?
23     A.    No, he told me what he had on his
24  qualifications, and he even said that they were all

Page 135

1  lies. That's not true, that none of it was. As far as
2  him playing for the Boston Cellicks, it was all lies.
3  And the reason he knows is because he contacted the
4  Boston Cellicks, and they never even heard of him.
5  Coach Hurley coached him in college. He knew the type
6  of person he was, so (did not finish response) --
7      Q.    Coach Hurley knew Mr. Starks?
8      A.    Right, yes.
9      Q.    Do you know if Mr. Hurley contacted Mr.
10  Starks?
11     A.    Well, I don't know if he did or not.
12     Q.    Do you think Mr. Starks was unqualified
13  for the position of Assistant Basketball Coach at
14  Clermont?
15     A.    Yes.
16     Q.    Is that inconsistent with what you said
17  before? I thought you said --
18         MR. MEZIBOV: Objection. It's
19  argumentative.
20     Q.    I thought you said before that the people
21  that apply for a job at Clermont were likely to be --
22  were not likely to be good candidates. Do you agree
23  with that?
24     A.    No --

Page 136

1         MR. MEZIBOV: Objection. Go ahead.
2      A.    I'm saying, if you have somebody who has
3  been coaching at an NAIA level or NCAA Division Level 3
4  level, why would you want to go coach at Clermont and
5  make no money coaching there. If you've already made
6  thousands of dollars coaching somewhere else, why lower
7  yourself and go to Clermont.
8      Q.    Okay. And what about Mr. Starks and his
9  qualifications?
10     A.    The only thing Coach Hurley told me was
11  that he was an assistant girls high school basketball
12  coach. That's all his coaching experience.
13     Q.    Have you ever had a chance to review Mr.
14  Starks' qualifications?
15     A.    I looked at his resume. It was given to
16  me.
17     Q.    After this lawsuit was filed?
18     A.    Right.
19     Q.    After you learned that you would not be
20  offered the position, did you call anyone from
21  Clermont?
22     A.    If I did, it was probably -- probably
23  Brian Sullivan, because we've stayed in contact.
24     Q.    What did you talk to Mr. Sullivan about?

Page 137

1      A.    I didn't understand how somebody who --
2  well, he kept -- actually, what it was, he kept telling
3  me -- he told me they offered the job to Keith Starks,
4  but his background check didn't come back right, and
5  they never could get ahold of him to even accept the
6  position. He just wouldn't return any phone calls.
7  And that's when he asked me if I'd still be interested
8  in the position if Keith didn't come in and sign the
9  contract.
10     Q.    What did you tell him?
11     A.    I told him I would like to be -- I'd still
12  be interested in the position.
13     Q.    Did you ask why you were not offered the
14  job?
15     A.    At that time, I was a little too upset to
16  even discuss it, so I didn't. I've talked with Coach
17  Hurley about it.
18     Q.    What did Coach Hurley tell you?
19     A.    Coach Hurley was not very happy about it
20  at all. You know, he made it a point that I was going
21  to be his number-one pick. And even when everything
22  was deferred to him for the hiring and I was his pick,
23  then it all changed again. So he was not happy about
24  it at all.

Page 138

1    Q.    Did he tell you why you were not offered
2  the position?
3    A.    No.  He didn't know, he just -- he just
4  said, "They asked me, I told him you were my number
5  one," or, "I ranked you as number one," and he said,
6  "Then I got a call saying they were going to offer it
7  to somebody else."
8    Q.    Did you speak with anyone else other than
9  Mr. Hurley and Mr. Sullivan?
10   A.    No, I don't think I did.
11   Q.    Did you receive a copy of George Wharton's
12 determination regarding your complaint of
13 discrimination?
14   A.    Yes.
15        (Moberly Exhibit No. 13 was marked for
16        identification.)
17   A.    (Witness reviewing document).
18   Q.    Is this a copy of George Wharton's
19 determination?
20   A.    Yes.
21   Q.    And you received a copy of this?
22   A.    Yes.
23   Q.    July 3rd is mentioned in the first
24 paragraph as the date that you filed your charge

Page 139

1  regarding discrimination; is that correct?
2    A.    That's when I sent that letter down that I
3  had to send to him, an email.
4    Q.    And by that, you're referring to -- let's
5  just get the numbers right.
6    A.    Number 9.
7    Q.    Number 9.
8        (Reference to previously-marked Moberly
9        Exhibit Nos. 8, 9, and 10.)
10   Q.    You sent it on an email, which is Moberly
11 Deposition Exhibit No. 8; is that right?
12   A.    (No response).
13   Q.    8 is the email that you sent to him.
14   A.    (Witness reviewing document).  Yeah, I
15 think so.
16   Q.    And then 9 is your letter?
17   A.    Right.
18   Q.    And then 10, you also attached, which is
19 the list of charges?
20   A.    Right.
21   Q.    Okay.
22        MR. MEZIBOV:  Just so the record is clear,
23 Jason's email said July 2nd.
24        MR. HOYING:  It looks like there's --

Page 140

1    Q.    July 2nd was the date you sent the email;
2  is that correct?
3    A.    Yes.
4    Q.    Then it says later in that paragraph that
5  you called Karen Faaborg on June 16th, 2008; does that
6  sound right?
7    A.    Yeah, it's possible.
8    Q.    That would have been the first time you
9  called her?
10   A.    (Witness reviewing document).
11        (Reference to previously-marked Moberly
12        Exhibit No. 13.)
13   Q.    I'm sorry, we're on Moberly Deposition
14 Exhibit 13.
15   A.    (Witness reviewing document).  Yeah, it
16 could have been the first time I talked to her.
17   Q.    That's the only time you talked to her;
18 isn't that correct?
19   A.    No, I talked to her a couple of times just
20 to get numbers, and she told me to contact -- you know,
21 contact Dr. Livingston and then contact George Wharton.
22 You know, different times she told me to contact
23 different people.
24   Q.    With Ms. Faaborg, it was just to get

Page 141

1  numbers?
2    A.    Right.
3    Q.    "Going to the second page, second
4  paragraph on that page, it says, "Later on June 23rd,
5  Kim Ellison and Brian Sullivan called Coach Hurley to
6  inform him that Keith Starks had been offered the
7  coaching position."  Do you know whether Coach Hurley
8  called you that same day to tell you that you were not
9  being offered the coaching position?
10   A.    No, he wouldn't have -- he wouldn't have
11 called me.  He wouldn't have told me this over the
12 phone, he would have told me in person.
13   Q.    The last paragraph says, "Jason" -- this
14 is George speaking to you -- "I recall, prior to filing
15 your Complaint, you made statements to me that there
16 was discrimination against African-American students.
17 When I asked you for contact information, you declined
18 and indicated the students would not come to me because
19 they feared retaliation."  Is that accurate, that you
20 did not give him the students' names?
21   A.    Yes.
22   Q.    He asked for the students' names; is that
23 correct?
24   A.    Well, actually right here he did

Page 142

1 (indicating). That's the first time he did.
2    Q.    He had never asked for the students' names
3 before that?
4    A.    No.
5    Q.    Okay. Later that summer, did you receive
6 any calls from the University about the job?
7    A.    (No response).
8    Q.    Let me start over. I'll strike that.
9         When did you learn that Mr. Starks had not
10 accepted the position?
11    A.    I think it was this August at some point.
12    Q.    Who told you that?
13    A.    Either August or September. Brian
14 Sullivan.
15    Q.    Did he call you?
16    A.    Yes.
17    Q.    Tell me what you recall from that
18 conversation.
19    A.    Just that they had been trying to get
20 ahold of Keith Starks to come in and do a background
21 check and file papers, sign a contract, and can't get
22 ahold of him, and he'd never returned any phone calls.
23    Q.    Mr. Sullivan indicated that Clermont
24 wanted to hire you for the position?

Page 143

1    A.    Yeah, that they were going to move on.
2    Q.    Did Nancy Reveal call you?
3    A.    No. I think I had to call -- when I
4 talked to Brian, I think that maybe I got transferred
5 over to her.
6         No, I take that back. She may have called
7 me. I think she called me once or twice.
8    Q.    Did you respond to her calls?
9    A.    I was working at the time, so I'd have --
10 I had to call her back, so (did not finish response) --
11    Q.    Do you recall what you discussed with
12 Nancy Reveal?
13    A.    She said that they wanted to offer the
14 position, but I needed to come down and sign the
15 contract and get a background check done.
16    Q.    Did you have a conversation with Ann
17 Appleton about the position?
18    A.    Yeah. I think I was going down that day
19 to go down and sign the contract.
20         (Reference to previously-marked Moberly
21         Exhibit No. 6.)
22    Q.    Paragraph 18 of the Complaint -- sorry,
23 it's Moberly Deposition Exhibit 6.
24    A.    (Witness reviewing document).

Page 144

1    Q.    Before I ask you that, let me ask you,
2 when you talked to Ms. Appleton, had the job already
3 been offered, do you recall?
4    A.    Well, actually, from Nancy, it was -- you
5 know, they -- they were going to -- it wasn't official,
6 "We're going to offer you the job." Nancy was, like,
7 "We're looking to offer you the job, you know, to
8 become Coach here and do this." So that's all that
9 was.
10    Q.    Did you accept?
11    A.    Well, I told her that -- actually, I told
12 her -- I remember telling Nancy at the time that I
13 would have liked to have had my attorney -- I'd like to
14 speak with my attorney, kind of have him present before
15 I signed the contract. And that wasn't -- they didn't
16 want that. It wasn't allowed.
17    Q.    Who said it wasn't allowed?
18    A.    Ann told me -- when I talked to her on the
19 phone, I was going down 275. I was on my way to the
20 college. And I told her, "I'd like to have my attorney
21 present." She said, "Well, you probably wouldn't be
22 offered the job, then."
23    Q.    Did she say --
24    A.    I needed either to sign the contract today

Page 145

1 or I wasn't going to have it.
2    Q.    Did she say anything else?
3    A.    No.
4    Q.    Did you sign the contract that day?
5    A.    Yeah, I did. I wanted to coach.
6    Q.    You signed the contract on August 21st?
7    A.    Yeah.
8    Q.    Did you record that conversation?
9    A.    No.
10    Q.    Did you record any of these conversations
11 with UC employees?
12    A.    No. I don't have nothing to do that with.
13    Q.    Did you tell Ms. Appleton that you
14 recorded the conversation?
15    A.    No. She asked me when I brought up my
16 attorney, that I wanted to have him present. I'm
17 driving down 275 in bumper-to-bumper traffic. There's
18 no way I can record any conversation.
19    Q.    Did you tell anyone else you recorded the
20 conversation?
21    A.    No.
22    Q.    You never told any coaches at UC that you
23 recorded a conversation?
24    A.    No.

Page 146

1      MR. HOYING:  This is Moberly Deposition
2  Exhibit No. 14.
3      (Moberly Exhibit No. 14 was marked for
4      identification.)
5  A.   (Witness reviewing document).
6  Q.   Is this a copy of the employment agreement
7  that you agreed to with UC?
8  A.   Yes.
9  Q.   And if you look on the second page, you're
10  accepting the position in this letter?
11  A.   Right.
12  Q.   And it looks like the date is 10/3/08; is
13  that correct?
14  A.   Right.
15  Q.   Is this the same letter you're referring
16  to that you came right down and signed on August 21st,
17  or is this a different letter?
18  A.   No.  August the 21st was -- it wasn't this
19  (indicating).  I don't know if it was as far as forms
20  to be put into the system or what, you know, like tax
21  forms and stuff like that.  But no, it wasn't this
22  (indicating).  I signed this on the 3rd.
23  Q.   Is this the one you rushed down to UC to
24  sign?

Page 147

1  A.   Yeah.
2  Q.   Okay.
3      MR. MEZIBOV:  Can we have a moment?
4      MR. HOYING:  Sure.
5      (At which time, a recess was taken from
6      1:09 p.m. until 1:13 p.m.)
7  Q.   Let me start by asking, do you want to
8  correct any of the dates, or do you think you've
9  figured out what happened here as far as the dates?
10  A.   Yeah.
11  Q.   Go ahead.
12  A.   October the 3rd, I did sign the contract.
13  August the 21st is when I met to file the Complaint
14  with my attorney.
15  Q.   Okay.
16  A.   So I filed the Complaint, and then I met
17  with her.  I signed the contract.
18  Q.   Okay.  After you accepted the position,
19  you served as the Assistant Basketball Coach for the
20  2008-'09 season, right?
21  A.   Yes.
22  Q.   You attended all practices?
23  A.   Yes.
24  Q.   Attended all games?

Page 148

1  A.   Yes.
2  Q.   Traveled with the team?
3  A.   Yes.
4  Q.   You're still employed as the Assistant
5  Basketball Coach?
6  A.   Yes.
7  Q.   As far as you know, you will be the
8  Assistant Basketball Coach for this next season?
9  A.   Yes.
10      (Reference to previously-marked Moberly
11      Exhibit No. 6.)
12  Q.   On Page 7 of the Complaint, if you still
13  have that.  It's Moberly Exhibit 6.
14  A.   (Witness reviewing document).
15  Q.   Page 7, Subparagraph 1, under the Prayer
16  for Relief, you ask Defendants to "reinstate you to the
17  position of Assistant Basket Coach."  Do you see that?
18  A.   Yes.
19  Q.   And you agree that Defendants offered and
20  you accepted the assistant coaching position?
21  A.   Yes.
22  Q.   You're not saying you're entitled to any
23  other position at the University?
24  A.   No.

Page 149

1  Q.   Are you claiming that you suffered any
2  loss of income as a result of this case?
3  A.   No.
4  Q.   In Paragraph 2 of the Prayer for Relief,
5  you ask for compensatory damages for injury to your
6  reputation.  How has your reputation been damaged by
7  any allegations in the Complaint?
8  A.   Well, it's the same as in the lawyer
9  world.  Everybody -- every lawyer knows every other
10  lawyer, and every coach knows every other coach.  It
11  would be hard for me to get another coaching job
12  somewhere without this coming up.
13  Q.   Well, let me ask you this.  What coming
14  up?
15  A.   The fact that I filed a lawsuit of
16  retaliation against an employer, another college, or at
17  the college.
18  Q.   Okay.  You aren't suggesting that another
19  college wouldn't somehow know that you weren't the
20  first choice for this position, are you?
21  A.   Well, if they call for a reference or
22  anything, I'm sure that it may come out.  I don't know.
23  Q.   Did you tell anyone else that you hadn't
24  been hired?

Page 150

1    A.   No.
2    Q.   Do you know if anyone from the University
3 told anyone else that you hadn't been the first choice?
4    A.   No, I don't.  I don't know.
5    Q.   You aren't aware of anyone else, anyone
6 from the University telling anyone else that you were
7 not the first choice for the position?
8    A.   Well, I do know that it's come up between
9 us and other colleges, other coaches around that we
10 know very well.  It's come up regarding -- they knew I
11 had to apply.  They knew -- they know what's going on
12 there at Clermont.  I mean, it's -- it's not a secret.
13 High school coaches know, and we're asked about it.
14 So, you know, we have to tell them what there is, that,
15 you know, right now, there's -- we really can't say
16 much about it.
17   Q.   But you were hired for the position?
18   A.   After I filed the Complaint.
19   Q.   How would any other coach know that you
20 weren't the first choice?
21   A.   Well, I mean, if every -- probably it
22 comes from us, I mean, if we was to disclose it.
23   Q.   You?
24   A.   From me or Coach Hurley.

Page 151

1    Q.   Okay.  Nobody else has disclosed that?
2    A.   Not that I know of, not that I'm aware of.
3    Q.   Okay.  Are you claiming that you suffered
4 any emotional distress as a result of the claims in
5 your Complaint?
6    A.   No.  I mean, I'm just really upset and
7 ticked off, but (did not finish response) --
8    Q.   You didn't suffer any symptoms from that?
9    A.   No.
10   Q.   You didn't consult with any healthcare
11 provider or counselor?
12   A.   No.
13   Q.   It never rose to that level?
14   A.   No.
15   Q.   Has your life changed at all because of
16 the allegations in your Complaint?
17   A.   I don't –
18        MR. MEZIBOV:  Objection.  You can answer.
19   A.   I don't know if you'd say that it's
20 changed.  I mean, I do the same thing I always have.
21 If kids have any problems, they come to me, and I try
22 to point them in the right direction.
23   Q.   You still work for Siemens.  I think that
24 you said that earlier.  Correct?

Page 152

1    A.   Yes.
2    Q.   You didn't suffer any consequences at that
3 job, did you?
4    A.   Other than I had had to call off today to
5 come down here, but (did not finish response) --
6    Q.   What about Dragon?  I don't think you ever
7 said why you left that position at Dragon.
8        MR. MEZIBOV:  Objection.
9    A.   I didn't like it.  I mean, it's a
10 family-owned Internet business that wasn't going
11 anywhere.
12   Q.   Did you get fired?
13   A.   No.
14   Q.   Also, I wanted to follow up on that
15 Alabama school you were describing that you've applied
16 to.  Is that an online school?
17   A.   It's online.  I haven't officially applied
18 to it.  I've got all my paperwork ready to go.
19   Q.   Do you have to move?
20   A.   No.
21   Q.   So you would take classes from here?
22   A.   Yeah.
23   Q.   I'm going to ask you about some of the
24 witnesses you've identified in the case.  S██████ D████

Page 153

1 is one of the people you've identified.  When is the
2 last time you spoke with him?
3    A.   Saturday.
4    Q.   What did you discuss with him on Saturday?
5    A.   Basically -- well, the only thing I
6 discussed with him is how we were going to move him
7 over to Poland, because he's going to probably get
8 offered a contract to play in Poland.
9    Q.   Anything about this deposition?
10   A.   No.
11   Q.   Did he know you filed a lawsuit against
12 the University?
13   A.   Yes.
14   Q.   How does he know that?
15   A.   Well, I told him.
16   Q.   Have you asked him to be a witness for
17 you?
18   A.   Yes.
19   Q.   What do you think he'll say about your
20 claims?
21   A.   He'll tell you the exact same thing that I
22 have.  I mean, he's a firsthand student there.  He
23 probably knows more than what I've told you.
24   Q.   Does he know anything about the reasons

39 (Pages 150 to 153)

Page 154

1  that you were not the first choice for the coaching
2  position?
3      A.    I don't know about that.  I don't know.  I
4  doubt it.
5      Q.    How often do you speak with him?
6      A.    Maybe once or twice a week, and then I see
7  him on Saturday.
8      Q.    Is he a player on that Milford team?
9      A.    Yes.
10     Q.    Who is Anthony Roberts?
11     A.    He was the Assistant Coach there before --
12  or while I was there my first year.  That ended up
13  being his last year.
14     Q.    How long have you known him?
15     A.    For about two years now, two-and-a-half
16  years.
17     Q.    When is the last time you spoke with him?
18     A.    Maybe a month ago, maybe.
19     Q.    Have you talked to him about the lawsuit?
20     A.    Yes.
21     Q.    What did you discuss?
22     A.    I just told him that -- you know, that I
23  had a lawsuit, you know, to help these -- regarding the
24  racism against these kids and my being retaliated

Page 155

1  against, and he's backing me -- he said, "I'll do
2  anything to help."
3      Q.    Did you ask him to testify for you?
4      A.    Yes.
5      Q.    How often have you talked with him?
6      A.    Last time I talked to him was about a
7  month ago.
8      Q.    How often do you talk to him?
9      A.    Maybe once a month, twice a month.
10     Q.    You identified Monica Johnson.  I think
11  you said you've never spoken to her; is that correct?
12     A.    Right.
13     Q.    Not even when she was an employee of the
14  University?
15     A.    Right.
16     Q.    And you don't have any other contact
17  information for her?
18     A.    Not with her.
19     Q.    Is there anyone else who has information
20  about the allegations in your Complaint that you
21  haven't already disclosed to us?
22     A.    Not that I can remember.
23     Q.    What about Mr. Mathews?  Is he a women's
24  coach?

Page 156

1      A.    Yes.
2      Q.    What's his first name?
3      A.    Mike.
4      Q.    Have you discussed this case with him?
5      A.    He knows that there's a case going on, but
6  that's about it.
7      Q.    Does he know that because you told him
8  that?
9      A.    Clermont is not a real big campus.
10     Q.    Did you ever tell him that you had any
11  tape-recording -- that you had tape-recorded any
12  conversations with University employees?
13     A.    No.
14     Q.    Did you discuss this case with anyone
15  else?
16     A.    No, not that I'm aware of.
17     Q.    Have you told anyone else that you filed a
18  lawsuit?
19     A.    Not that I can -- not that I can think of.
20           MR. HOYING:  Okay.  We'll take maybe a
21  five-minute break.
22           (At which time, a recess was taken from
23           1:25 p.m. until 1:30 p.m.)
24           MR. HOYING:  That's all I I have.

Page 157

1           MR. MEZIBOV:  I have just one question or
2  so.
3           Can we have this marked?
4           (Moberly Exhibit No. 15 was marked for
5           identification.)
6           EXAMINATION
7  BY MR. MEZIBOV:
8      Q.    Mr. Moberly, let me hand you what has now
9  been marked as Moberly Exhibit 15, and ask if you've
10  seen that document before?
11     A.    (Witness reviewing document).  Yes.
12     Q.    What is that document?
13     A.    This is the -- when I had to go down and
14  get fingerprint testing done.
15     Q.    Okay.  And this is a letter?
16     A.    Yes.
17     Q.    Who is it from?
18     A.    Ms. Appleton.
19     Q.    Is it addressed to you?
20     A.    Yes.
21     Q.    What is the date of this letter?
22     A.    October 20th, 2008.
23     Q.    Did you receive this letter?
24     A.    Yes.

Page 158

1    Q.   All right. And what is the subject of
2  that letter?
3    A.   Let's see. (Witness reviewing document).
4  It's a letter of employment that I signed on October
5  the 3rd.
6    Q.   All right. Were you asked to do
7  something?
8    A.   To go get my fingerprinting done.
9    Q.   Okay. Did you do that?
10    A.   Yes.
11    Q.   Now, in connection with this letter --
12  strike that. Did you have any discussions with
13  Ms. Appleton concerning this letter?
14    A.   None other than -- other than I had to go
15  get it done. I mean, I had to have a background check.
16    Q.   And how do you know a background check was
17  done?
18    A.   I'm sorry?
19    Q.   How do you know a background check was
20  done?
21    A.   Well, I went down to the main campus and
22  met with an officer there, who did my fingerprinting,
23  and she said it would be back in a week, and I think it
24  ended up being like three or four weeks.

Page 159

1    Q.   And do you know what your background check
2  consisted of?
3    A.   Just any prior convictions, felonies.
4      (Reference to previously-marked Moberly
5      Exhibit No. 2.)
6    Q.   All right. Let me show you what has been
7  previously marked as M2. That was identified by you
8  earlier.
9    A.   Yes.
10    Q.   Did you have any discussions about the
11  subjects of M2 with anybody from the University?
12    A.   Well, I did -- the lady who I had the
13  background check -- who did the background check, I let
14  them know that I had a disorderly conduct. And I
15  believe I even let Ms. Appleton know that I had a
16  disorderly conduct. And I know Nancy Reveal knew.
17    Q.   Okay.
18    A.   Because I told them it would show up.
19    Q.   Did any of these individuals make a
20  statement about your disorderly conduct?
21    A.   They said not to really worry about it,
22  it's just a misdemeanor.
23    Q.   All right. At any time after October
24  29th, 2008 was your job offer rescinded or withdrawn?

Page 160

1    A.   On the 29th?
2    Q.   At any time, the 29th or any time after.
3    A.   No, not after I had my background check
4  done, no.
5      MR. MEZIBOV:  That's all the questions.
6      MR. HOYING:  I have no follow-up.
7
8
9      _____
        JASON MOBERLY
10
11      - - -
12    DEPOSITION CONCLUDED AT 1:40 P.M.
13      - - -
14
...

Page 161

1      C E R T I F I C A T E
2  STATE OF OHIO        :
                         : ss
3  COUNTY OF HAMILTON   :
4      I, Raymond E. Simonson, RMR, the
5  undersigned, a duly qualified and commissioned notary
6  public within and for the State of Ohio, do hereby
7  certify that, before giving of the aforesaid
8  deposition, JASON MOBERLY, was by me first duly sworn
9  to depose the truth, the whole truth, and nothing but
10  the truth; that the foregoing is the deposition given
11  at said time and place by JASON MOBERLY; that said
12  deposition was taken in all respects pursuant to
13  stipulations of counsel hereinbefore set forth; that I
14  am neither a relative of nor employee of any of their
15  counsel, and have no interest whatever in the result of
16  the action.
17      I further certify that I am not, nor is
18  the court reporting firm with which I am affiliated,
19  under a contract as defined in Civil Rule 28(D).
20      IN WITNESS WHEREOF, I hereunto set my hand
21  and official seal of office at Cincinnati, Ohio, this
22  _____ day of _____, 2009.
23      _____
My commission expires:  RAYMOND E. SIMONSON, RMR
24  June 22, 2013      Notary Public - State of Ohio

41 (Pages 158 to 161)