**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

JASON MOBERLY,

Plaintiff,

vs.

UNIVERSITY OF CINCINNATI CLERMONT COLLEGE, *et al.*,

Defendants.

Case No. 1:08-cv-569

Judge Herman J. Weber
Magistrate Judge Timothy S. Black

**REPORT AND RECOMMENDATION[1] THAT: (1) DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Doc. 13) BE GRANTED; AND (2) THIS CASE BE CLOSED**

This civil action is before the Court on Defendants' motion for summary judgment (Doc. 13) and the parties' responsive memoranda (Docs. 21, 25).

## I. BACKGROUND

This is a civil rights action alleging that Defendants discriminated against Plaintiff, the assistant basketball coach for the University of Cincinnati Clermont College ("Clermont"), as a direct result of his protest against what he perceived was the College's discriminatory treatment of protected racial minorities. Specifically, Plaintiff alleges that subsequent to his advocacy on behalf of the basketball team's minority players, Defendants[2] retaliated against him by rejecting his application for reappointment to the

---

[1] Attached hereto is a NOTICE to the parties regarding objections to this Report and Recommendation.

[2] Defendants include Clermont; Ann Appleton, Assistant Dean of Student Servics at Clermont; Kimberly Ellison, Director of Student Life at Clermont; and James McDonough, Dean of Clermont.

assistant coaching position. (Doc. 1 at ¶ 1). Plaintiff seeks relief including punitive damages, costs, and reasonable attorney fees. (*Id*. at ¶ 2).

## II. UNDISPUTED FACTS[3]

1. Defendant Clermont College ("Clermont") is a regional campus of the University of Cincinnati located in Batavia Township, Ohio. (Doc. 13, Ex. 2 at ¶ 2).

2. Clermont has its own intercollegiate athletics program with teams competing in men's and women's basketball, men's golf, women's softball, women's volleyball, and men's baseball. (*Id*. at ¶ 3).

3. Plaintiff Jason Moberly first applied for an assistant basketball coach position at Clermont in October 2007. (Doc. 11 at 21-22; Ex. 5).

4. He previously coached basketball at Southern State Community College, but his coaching contract was not renewed because of differences of opinion that he had with the athletic director. (*Id*. at 25-28).

5. After coaching at Southern State, Plaintiff contacted the head coach of Clermont's men's basketball team, John Hurley, and expressed an interest in being hired as the assistant coach. (Doc. 11 at 32-33).

6. It was too late in the year for Clermont to hire him, but Plaintiff helped Coach Hurley with the team during the 2007-08 season. (*Id*. at 35).

7. Clermont paid Plaintiff through a temporary service and encouraged him to apply the following year. (*Id*.)

8. Plaintiff's responsibilities included attending all practices and games, traveling with the team, and going to high school games to recruit players to attend Clermont. (*Id*. at 35-37).

9. Following the 2007-08 season, Clermont Athletic Director Brian Sullivan informed Plaintiff that if he wanted to continue coaching at Clermont in

---

[3] These are the parties' common undisputed facts taken from Plaintiff's highlighted version of Defendants' proposed findings of fact and conclusions of law. (*See* Doc. 22).

2008-09, he would need to apply and interview for the assistant coach position. (*Id*. at 111).

10. Plaintiff had not been interviewed the previous year and was not officially a Clermont employee. (*Id*. at 35).

11. Mr. Sullivan and Coach Hurley informed Plaintiff that Clermont had to follow the University's formal hiring process and interview at least three applicants before Plaintiff could be offered the job. (*Id*. at 112).

12. Plaintiff followed the application process, but admitted that he "wasn't real happy that [he] had to apply for the job in the first place." (*Id*.)

13. Plaintiff interviewed for the assistant coach position in June 2008 with Kim Ellison, Mr. Sullivan, and Coach Hurley. (*Id*. at 118).

14. Plaintiff knew that he was not the only person who had applied for the assistant basketball coach position, and he knew that Ms. Ellison, Mr. Sullivan, and Coach Hurley had interviewed two other candidates. (*Id*. at 122-23).

15. Following the interview, Coach Hurley called Plaintiff and told him that he probably would receive the position. (*Id*. at 119-20).

16. Coach Hurley believed that it was up to him to decide who he wanted to be the assistant coach, and he wanted Plaintiff to be hired. (*Id*. at 121).

17. When Plaintiff received this call from Coach Hurley, Plaintiff understood that Coach Hurley was not offering him the job and that the hiring process was not complete. (*Id*. at 120).

18. Later in June 2008, Coach Hurley informed Plaintiff that "things had come up" and that Ms. Ellison, who oversaw intercollegiate athletics, had "changed her mind" and "wanted to go in a different direction." (*Id*. at 121-22).

19. Although Coach Hurley continued to support Plaintiff for the position, Plaintiff was concerned that he was no longer Clermont's first choice. (*Id*. at 126).

20. Plaintiff knew that he might not be selected for the assistant coach position. (*Id*. at 126).

21. On June 16, 2008, Plaintiff called Karen Faaborg, the University's vice-provost at the main campus. (*Id*. at 140).

22. Plaintiff asked Ms. Faaborg whom he should talk to about discrimination at Clermont. (*Id*. at 86; 140-41).

23. He also told her that he was concerned that he might not receive the assistant coach position. (*Id*. at 126).

24. Ms. Faaborg set up meetings for Plaintiff to discuss his concerns with Clermont's Dean, James McDonough, and the University's Director of Equal Opportunity, George Wharton. (*Id*. at 86).

25. On June 23, 2008, Ms. Ellison and Mr. Sullivan offered the assistant basketball coach position to Keith Starks, another candidate who had applied for the job. (Doc. 13, Ex. 2 at ¶¶ 9-10).

26. Ms. Ellison reviewed the three candidates' credentials earlier in the month. (*Id*. at ¶ 9).

27. On the morning of June 23, 2008, Ms. Ellison and Mr. Sullivan called Mr. Starks to offer him the job, and then called Coach Hurley to inform him of their decision. (*Id*. at ¶ 10).

28. Coach Hurley was upset that he had not been notified in advance of their decision. (*Id*.)

29. Coach Hurley then informed Plaintiff that he was not selected for the position, even though he and Mr. Sullivan still supported him. (Doc. 11 at 132-33).

30. When Plaintiff contacted George Wharton later in the day on June 23, 2008, he knew that Clermont had offered the position to another candidate. (*Id*. at 87-89, 131).

31. Plaintiff discussed with Mr. Wharton alleged instances of race discrimination at Clermont toward members of the men's basketball team. (*Id*. at 89-91).

32. Plaintiff complained to Mr. Wharton about not getting the assistant coach position. (*Id*. at 131).

33. Mr. Wharton asked Plaintiff to send his complaints to him in writing together with any documentation that he had. (*Id*. at 91).

34. Plaintiff wrote a letter describing his retaliation claim and a list outlining the discrimination he observed. (*Id.*, Exs. 8, 9, 10).

35. Plaintiff sent the letter and list to Mr. Wharton on July 2, 2008, more than a week after Mr. Sullivan and Ms. Ellison had offered the job to Mr. Starks. (*Id*. at 91-93; Exs. 8, 9, 10).

36. Plaintiff did not contact Dean McDonough until June 25, 2008. (*Id*. at 105; Ex. 11).

37. At that time, Plaintiff was aware that Clermont had already offered the assistant coach position to Keith Starks. (*Id.* at 107).

38. After their conversation, Plaintiff sent Dean McDonough an email stating: "I would also like to know how my coaching position is coming because I can either move on to another college or I can get in touch again with Mr. Wharton at the main campus, and my lawyer to see what other actions need to be done." (*Id.*, Ex. 12).

39. Plaintiff provided details about alleged discrimination toward members of the men's basketball team in his conversation with Dean McDonough on June 25, 2008 and in his letter to George Wharton on July 2, 2008. The instances of discrimination took place earlier in the year and even in 2007. (*Id*., Ex. 10).

40. Plaintiff claimed that in the spring, an African American basketball player told him that he had been denied access to Clermont's Learning Disability Center, even though Caucasian students were allowed access. (*Id*. at 42-43).

41. Plaintiff had never been to Clermont's Learning Disability Center, and he was not present when the alleged incident occurred. (*Id.* at 44).

42. Plaintiff acknowledged that the student was denied access only on one occasion. (*Id*. at 67-68).

43. Plaintiff also acknowledged that many people at Clermont, including Athletic Director Sullivan, had tried to help the student with his scheduling and his classes. (*Id*. at 66).

44. Plaintiff also claimed that during the 2007-08 season an employee in Clermont's Student Services office made a racially insensitive comment about one of the players on the basketball team. (*Id*. at 48-49).

45. Again, Plaintiff was not present when the comment was allegedly made. (*Id*. at 51).

46. Plaintiff claimed that the racially insensitive comment was overheard by a former employee, Monica Johnson, who told Mr. Sullivan, who told Plaintiff. (*Id*. at 48-50).

47. Plaintiff did not know the name of the employee who allegedly made the offensive comment. (*Id.* at 51).

48. Plaintiff never personally observed any unfair discriminatory treatment at the Student Services Office. (*Id.*)

49. Plaintiff stated that during the middle of the 2007-08 season, Clermont proposed to change the academic eligibility requirements for student athletes. (*Id*. at 55).

50. The proposed changes applied to all student athletes. (*Id*. at 97).

51. Plaintiff stated that five African American basketball players would have been ineligible if the change had been implemented. (*Id*. at 57-58).

52. Before any player missed a game, the proposed eligibility changes were abandoned. (*Id*. at 58).

53. One student was not eligible to play in the national tournament, but the student was ineligible because of an error in his financial aid, not his GPA. (*Id*. at 59). The University investigated Plaintiff's allegations. (Doc. 11, Ex. 13 at 2).

54. After Mr. Starks verbally accepted the assistant coach position, Clermont sent him a letter informing him that he needed to undergo a pre-employment criminal records background check. (Doc. 13, Ex. 1 at ¶ 4).

55. Mr. Starks never responded. (*Id*. at ¶ 5).

56. After several unsuccessful attempts to contact Mr. Starks by phone, Clermont rescinded its offer to him. (*Id*. at ¶ 5; Doc. 11 at 142).

57. When the offer to Mr. Starks was rescinded, Clermont offered the assistant coach position to Plaintiff. (*Id.*)

58. On August 21, 2008, Ann Appleton, Clermont's Assistant Dean, spoke to Plaintiff by phone and offered him the job. (*Id.*; Doc. 11 at 143; *see also* Doc. 1 at ¶ 18).

59. Plaintiff signed a letter accepting the position on October 3, 2008. (*Id.*; Doc. 11, Ex. 14).

60. Plaintiff's job as the assistant coach started on October 19, 2008. (*Id*.)

61. Plaintiff accepted the position before the beginning of Clermont's 2008-09 basketball season. (Doc. 11 at 147).

62. His duties were the same as the previous year; he attended all practices and games and traveled with the team. (*Id*. at 148).

63. Because he was a regular Clermont employee, Plaintiff did not need to interview for the position for the upcoming 2009-10 year. (*Id*. at 148).

64. Plaintiff will continue as Clermont's assistant men's basketball coach this year (2009-10). (Doc. 13, Ex. 1 at ¶ 7).

65. Plaintiff does not claim that Clermont owes him any backpay. (Doc. 11 at 149).

66. Plaintiff did not tell anyone that he was Clermont's second choice for the position, and he did not know of anyone else at Clermont who shared that information either. (*Id*. at 149-50).

## III. STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action. *Celotex*, 477 U.S. at 323. All facts and inferences must be construed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (1986).

## IV. ANALYSIS

### A. Plaintiff's Title VI Claim Against Clermont

Absent direct evidence of retaliation, a plaintiff may establish a *prima facie* case of retaliation by establishing four elements: (1) the plaintiff engaged in activity protected by Title VI;[4] (2) this exercise of protected rights was known to the defendant; (3) the

[4] Title VI provides that "no person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

defendant thereafter took a materially adverse action against the plaintiff or subjected the plaintiff to severe and pervasive retaliatory harassment; and (4) there was a causal connection between the protected activity and the materially adverse action. *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 595-596 (6th Cir. 2007).

**1. Protected activity**

In order to prevail on his retaliation claim, Plaintiff must show that he engaged in protected activity by opposing a practice made unlawful by Title VI. *Thompson v. North American Stainless*, 567 F.3d 804, 815 (6th Cir. 2009). He must also show that he engaged in protected activity before Clermont made the decision to offer the assistant coach position to another applicant. Clermont offered the job to Keith Starks on June 23, 2008. (Doc. 13, Ex. 2, ¶ 10; Doc 22 at 4). Therefore, in order for Plaintiff to prove that Clermont's actions were retaliatory, he must show that he engaged in protected activity before June 23, 2008.

Plaintiff called Ms. Faaborg on June 16, 2008, before learning that he did not receive the position. (Doc. 11 at 140). Plaintiff's own description of the conversation is as follows:

> Q. What did you discuss with Ms. Faaborg?
> A. Basically just how I felt the kids were treated, weren't treated very well. You know, I did tell her when I talked to her that I was afraid - I did just interview for the position, and I was afraid that it would hurt my chances of actually getting the position.
> Q. Did you discuss the substance of your complaints, or just notify her that you had complaints?
> A. I just told her I had complaints, and asked her who I needed to talk to. And

she asked me if I spoke with anybody at the college yet. And I told her that Dean McDonough wasn't there. And she said that she would call him and set up a meeting and then talk with him.[5]

Q. Did she ask you for names of students?
A. No.
Q. You didn't get that far in the conversation?
A. No.

(Doc. 11 at 85-86). Plaintiff's only complaint to Ms. Faaborg was that "kids weren't treated very well." (*Id*. at 85). His description of the conversation does not support the contention that he communicated his opposition to any discriminatory practice.

In response to Defendants' motion for summary judgment, Plaintiff contends for the first time in an affidavit, that during his June 16, 2008 telephone conference with Ms. Faaborg, he told her that his complaints related to the treatment of African American student athletes, and specifically gave her an example of an African American athlete who had been called "black trash" by a Clermont employee. (Doc. 21, Ex. B at ¶ 2). Plaintiff claims that his affidavit is merely an "expansion" of his deposition testimony, but the affidavit directly contradicts the description of his conversation with Ms. Faaborg that he gave in his deposition. In the affidavit, Plaintiff states that "[d]uring my deposition I was not specifically asked what I did say to Ms. Faaborg." (*Id*.) However, during the deposition Plaintiff was asked, "[w]hat did you discuss with Ms. Faaborg." (Doc. 11 at 85). Moreover, Plaintiff repeatedly stated in his deposition that he did not discuss any details of his complaints with Ms. Faaborg and that he only called her to ask

[5] Plaintiff did not follow up with any of the Clermont administrators.

for contact information of persons to whom he could make a report. (*Id*. at 86, 87, 140-41).[6]

A "party may not create a factual issue by filing an affidavit after a motion for summary judgment has been made, which contradicts [his] earlier deposition testimony." *Smith v. Heartland Employment Serv.*, No. 2:07-cv-362, 2009 U.S. Dist. LEXIS 24400 (S. D. Ohio 2009) (citing *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986)). That is precisely what Plaintiff has done in this instance.

Even if Plaintiff did tell Ms. Faaborg that his complaints related to discrimination, a "vague complaint of discrimination" is insufficient as a matter of law to show protected, opposition activity. Plaintiff's communication with Ms. Faaborg was insufficient to put the school on notice that he was complaining about the manner in which African American students were being treated at Clermont based on race because he never discussed any specifics of his complaints with her. *Booker v. Brown & Williamson*

---

[6] Plaintiff maintains his affidavit is supported by additional evidence. For example, in a letter to George Wharton written shortly after his June 16, 2008, conversation, Plaintiff wrote that he had "contacted Karen Faaborg regarding the way that African American students were being treated by the Student Services area." (Doc. 11, Ex. 9). Additionally, Plaintiff claims that the nature of Ms. Faaborg's response to the concerns registered by Plaintiff also makes clear that she was on notice of his opposition to the discriminatory manner in which African Americans were being treated at the College. During their June 16, 2008 conversation, Ms. Faaborg recommended to Plaintiff that he contact three University administrators all of whom are directly related to diversity issues: (1) George Wharton, UC's Director of the Office of Equal Opportunity; (2) Eric Abercrombie, UC's Director of Ethnic Programs and Services; and (3) Mitchel D. Livingston, UC's Vice President for Student Affairs and Chief Diversity Officer. (Doc. 11 at 86; Doc. 21, Ex. B at ¶ 2). Additionally, in a June 23, 2008 email to George Wharton, Ms. Faaborg wrote that "Jason Moberly has contacted me again about the charge of discrimination he is making." (Doc. 11, Ex. 7).

*Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989) ("a vague charge of discrimination . . . is insufficient to constitute opposition to any unlawful employment practice").[7]

In response, Plaintiff cites *Crawford v. Metro. Gov't of Nashville*, 129 S.Ct. 846, 851 (2009), and argues that "when an employee communicates to his employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication virtually always constitutes the employee's opposition activity." However, the plaintiff in *Crawford* engaged in protected activity by reporting *specific instances* of sexual harassment, including occasions when a human resources officer "grabb[ed] his crotch" in her presence and "entered her office and grabbed her head and pulled it to his crotch." *Id*. at 849.

Viewed in the light most favorable to Plaintiff, the record in this case makes clear that Ms. Faaborg was not put on notice that Plaintiff was opposing a racially discriminatory manner in which African American students allegedly were treated at Clermont.

**2. Adverse employment**

Even if the undersigned found that Plaintiff presented sufficient evidence that he engaged in protected activity, his claim would still fail because he did not experience any

[7] Additionally, Defendants argue that even if Plaintiff did make such a complaint to Ms. Faaborg, he did not do so in good faith but as part of a premeditated plan to protect his assistant coaching position. Plaintiff acknowledged that he was concerned that he might not be Clermont's first choice for the coaching position even before he called Ms. Faaborg on June 16, 2008. (Doc. 11 at 126). He also admitted that by complaining about discrimination he was "preparing himself" in case he did not get the job. (*Id*. at 129).

adverse action. The Sixth Circuit and the Supreme Court require a retaliation plaintiff to show a materially adverse action taken by the employer that results in some change to the plaintiff's employment conditions. *See White v. Burlington N. & Santa Fe Ry. Co.*, 548 U.S. 53, 67 (2006); *James v. Metro. Gov't of Nashville*, 243 Fed. Appx. 74, 79 (6th Cir. 2007).

Plaintiff interviewed for the position in June 2008. After Clermont initially offered the position to Mr. Starks and then rescinded it, Clermont offered the job to Plaintiff on August 21, 2008. (Doc. 22 at 8). Plaintiff accepted the position on October 3, 2008, and the job as the assistant coach did not start until October 19, 2008. (*Id*. at 8-9).

The fact that Clermont initially offered the assistant basketball coaching position to Mr. Starks was not an adverse action. Clermont never officially turned Plaintiff down for the job. For example, in *Semsroth v. City of Wichita*, 555 F.3d 1182, 1185 (10th Cir. 2009), the court assumed that a school employee's initial denial of a transfer request was materially adverse. Relying on Sixth Circuit precedent, the court held that the adverse action was "negated" when she received the position before the beginning of the school year. *Id*. The *Semsroth* court reasoned that there was no adverse action when the employee's "receipt of the position (without any attendant advantages) was not even delayed, much less denied." *Id*. In the instant case, not only did Plaintiff receive the assistant coaching position in time for the 2008-2009 season, he is still employed in that

capacity. (Doc. 13, Ex. 1 at ¶ 7).

Accordingly, Plaintiff's Title VI claim fails as a matter of law.

## B. Individual Defendants

### 1. Title VI claim

The individual Defendants cannot be held liable under Title VI, because Title VI's prohibition against race discrimination only applies to "any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. *See Davis v. Flexman*, 109 F.Supp.2d 776, 793 (S.D. Ohio 1999) ("[C]ourts construing Title VI, which prohibits racial discrimination, have found no individual liability under that statute."); *see also Soper v. Hoben*, 195 F.3d 845, 854 (6th Cir. 1999) (The district court correctly dismissed defendants in their individual capacities from plaintiff's claims under Title IX because, like Title VI, "only recipients of federal funds may be liable for damages."). The individual defendants are not "recipients of federal funding," so Plaintiff's Title VI claim against them fails as a matter of law.

### 2. Section 1981 claim

Summary judgement is warranted on Plaintiff's Section 1981 claims against the individual Defendants for the same reasons that the undersigned recommends that it be granted on the Title VI claim against Clermont. Plaintiff's Section 1981 retaliation claim[8]

---

[8] Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts, to sue, be parties, give evidence, and to enjoy the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." 42 U.S.C. § 1981.

is subject to the same evidentiary standards as his Title VI claim against Clermont. *See, e.g.*, *Tyson v. University of Cincinnati*, No. 1:02-cv-907, 2005 U.S. Dist. LEXIS 9350 (S.D. Ohio 2005). To prove a Section 1981 claim, Plaintiff has the burden of proving that: (1) he engaged in activity protected by the discrimination statutes; (2) the exercise of his civil rights was known to the defendants; (3) thereafter, the defendants took an employment action adverse to plaintiff; and (4) there was a casual connection between the protected activity and the adverse employment action. *Id*. at *5.

Defendants did not take any materially adverse action against Plaintiff. (*See supra*, Section IV.A.2). Accordingly, Plaintiff's Section 1981 claims against the individual Defendants fail as a matter of law.

**3. Section 1983 Claim**

To succeed on a claim of First Amendment retaliation, a plaintiff must establish: (1) that he engaged in constitutionally protected activity; (2) that Defendants' adverse action caused him to suffer injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of Plaintiff's constitutional rights. *Haynes v. Circleville*, 474 F.3d 357, 362-363 (6th Cir. 2007); *Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir. 1998). Defendants challenge Plaintiff's ability to establish the first two elements of his claim.

### a. Whether Plaintiff's discrimination complaint was constitutionally protected speech

A citizen's speech will be considered "protected" by the First Amendment only if it involves a matter of public concern. *Watts v. Day*, 129 Fed. Appx. 227, 234 (6th Cir. 2005), *citing Connick v. Myers*, 461 U.S. 138, 147 (1983). To determine whether speech addresses such a matter, the court must look to the content, form, and context of a given statement as revealed by the whole record. *Dambrot v. Cen. Mich. Univ.*, 55 F.3d 1177, 1186 (6th Cir. 1995).

Plaintiff cites multiple cases to support the position that his complaint was constitutionally protected. *See, e.g., Baxter v. State of Tennessee Dep't of Corr.*, 831 F.2d 293 (6th Cir. 1987) (plaintiff appeared on local radio talk show to discuss racially based discrimination at youth center); *Boger v. Wayne County*, 950 F.2d 316, 318 (6th Cir. 1991) (county employee made a statement to a newspaper reporter about racial harassment); *Johnson v. University of Cincinnati*, 215 F.3d 561, 568 (6th Cir. 2000) (plaintiff's memorandum to university cabinet officials relating to affirmative action program). However, in each of these cases, employees spoke *publicly* about discrimination. Those are not the facts of the instant case.

The only speech Plaintiff engaged in before June 23, 2008 was the telephone call he made to Ms. Faaborg, in which he did not discuss any specifics about his complaints. (Doc. 11 at 85-87; *see also* Section IV.A.1, *supra*). There is no evidence that Plaintiff spoke publically about discrimination or even that he made a discrimination complaint at

all.

**b. Whether Plaintiff suffered an adverse action**

Even if the undersigned found that Plaintiff's complaints constituted constitutionally protected speech, his claim would still fail because he fails to establish any adverse action.

In the First Amendment retaliation context, an adverse action is one that causes "an injury that would likely chill a person of ordinary firmness from continuing to engage in [protected activity]." *Scarbrough v. Morgan County Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006). Courts have made clear that a wide variety of actions can be sufficiently adverse to have a chilling effect. *See, e.g. Rutan v. Republican Party of Illinois*, 497 U.S. 62 (1990) (placing employees in dead-end positions and unreasonably denying transfers may be adverse action); *Henley v. Tullahoma City School Sys.*, 84 Fed. Appx. 534, 540 (6th Cir. 2003) (denying a high school athlete an opportunity to play on the basketball team may be adverse action); *Thaddeus-X v. Blatter*, 175 F.3d 378, 399 (6th Cir. 1999) (harassing a prison inmate and denying him cold meals may be adverse action).

Plaintiff has failed to show that he suffered an adverse action sufficient to dissuade any person of ordinary firmness from engaging in free speech. *Scarbrough*, 470 F.3d at 255. Clermont's initial decision to offer the assistant coach position to another candidate did not effect Plaintiff's employment with Clermont in any way, and during the time Plaintiff has been employed by Clermont since he filed this lawsuit, he has not been

deterred in continuing to raise issues with Clermont's administration. In fact, Plaintiff stated, "I do the same thing I always have." (Doc. 11 at 151). *See also Smith v. Yarrow*, 78 Fed. Appx. 529, 541 n.8 (6th Cir. 2003) (the fact that the plaintiff was not deterred by an alleged adverse action is "probative evidence" that no adverse action occurred). For example, in October 2009, he complained about an African American player who had allegedly been falsely accused of stealing. (Doc. 11 at 53). Plaintiff also advocated having a former player's jersey retired by the University, allegedly over the opposition of Clermont's administration.[9] (*Id*. at 70-73).

Accordingly, Plaintiff's Section 1983 claim fails as a matter of law.

## V. CONCLUSION

Based on the evidence of record, the undersigned finds that Defendants' motion for summary judgment is well taken as there are no genuine issues of material fact in dispute, and Defendant is entitled to entry of judgment. It is therefore **RECOMMENDED** that Defendants' motion for summary judgment (Doc. 13) be **GRANTED**, and that this case be **CLOSED**.

Date: February 1, 2010

s/ Timothy S. Black
Timothy S. Black
United States Magistrate Judge

---

[9] The player held the scoring record at Clermont, and his jersey was retired at a ceremony in January 2009. (*Id*. at 73).

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| JASON MOBERLY,<br><br>Plaintiff,<br><br>vs.<br><br>UNIVERSITY OF CINCINNATI CLERMONT COLLEGE, *et al.*,<br><br>Defendant. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | Case No. 1:08-cv-569<br><br>Judge Herman J. Weber<br>Magistrate Judge Timothy S. Black |

**NOTICE**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation ("R&R") within **14 DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **14 DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).